STATE OF NORTH CAROLINA v. McKEITHAN JONES; PHILLIP
    JONES; REDELL LOCKLEAR; JAMES EDWARD LOCKLEAR,
    ALIAS, JIMMY LOCKLEAR; AND STERLING JONES

No. 132

(Filed 28 January 1972)

1. Criminal Law § 92— consolidation of charges against multiple de-
    fendants

    Ordinarily, unless it is shown that irreparable prejudice will result
    therefrom, consolidation for trial rather than multiple individual trials
    is appropriate when two or more persons are indicted for the same
    criminal offense.

2. Criminal Law § 92— charges against six defendants — consolidation
    for trial

    Where five defendants were jointly charged in two indictments
    with safecracking, felonious breaking and entering and felonious
    larceny, and a sixth defendant was separately charged in two indict-
    ments with the identical crimes, there was no error in the consolida-
    tion *per se* of the charges in the four indictments for the purposes
    of trial.

3. Constitutional Law § 30; Criminal Law § 95— codefendant's confession
    implicating defendant — due process

    The admission of a testifying codefendant's extrajudicial state-
    ments which incriminated defendant under instructions limiting their
    competency to the codefendant did not deny defendant due process of
    law where there was sufficient competent evidence admitted against
    defendant to minimize or remove such prejudice as might otherwise
    have been caused by the statements attributed to the codefendant.

4. Constitutional Law § 31; Criminal Law § 95— confession implicating
    codefendant — declarant who took the stand

    Extrajudicial statements made by defendants which implicated
    a codefendant were not rendered inadmissible by the decision of
    *Bruton v. United States*, 391 U.S. 123, where each declarant took the
    stand and testified that the substance of the statements attributed
    to him was false.

5. Constitutional Law § 30; Criminal Law § 95— confession implicating
    codefendant — confrontation of declarant — due process

    Even when the right of confrontation is afforded to a defendant
    implicated in the out-of-court declarations of a codefendant, the
    prejudicial impact of testimony of the codefendant's declarations
    must be evaluated in the light of the competent evidence admitted
    against the nondeclarant defendant, since the gap between the impact
    of evidence which is not admitted against but incriminates the non-
    declarant and of competent evidence of minimal probative value ad-
    mitted against him in a given case may be so great as to constitute a
    denial of due process.

6. **Criminal Law §§ 162, 169— admission of incompetent evidence — failure to object — defendant unrepresented by counsel**

The admission of incompetent evidence is ordinarily not ground for a new trial where there was no objection at the time the evidence was offered, even though defendant asserts on appeal that the evidence was obtained in violation of his constitutional rights; unless necessary to obviate manifest injustice, this rule applies to an unrepresented nonindigent defendant as well as to a defendant represented by counsel.

7. **Constitutional Law § 31; Criminal Law § 95— nontestifying codefendant's extrajudicial statements — incrimination of defendant — harmless error**

The admission of extrajudicial statements attributed to a nontestifying codefendant — e.g., that "there were six of us involved" and that "they got the safe" — did not violate defendant's right of confrontation since the statements did not in fact incriminate defendant; if defendant was obliquely incriminated by such statements, the constitutional error was harmless beyond a reasonable doubt in light of the mass of competent and admitted evidence against defendant.

BELATED appeal (permitted by our writ of *certiorari*) by Phillip Jones, James Edward Locklear and Sterling Jones from *Braswell, J.*, October 1970 Regular Criminal Session of ROBESON Superior Court, transferred for initial appellate review by the Supreme Court under general order of July 31, 1970, entered pursuant to G.S. 7A-31(b)(4).

Appellants Phillip Jones and James Edward Locklear, alias Jimmy Locklear, together with McKeithan Jones, Frank Jacobs, Jr., and Redell Locklear, were charged in a one-count indictment (70CR11266) with "safecracking" in violation of G.S. 14-89.1, and in a separate two-count indictment (70CR11343) with (1) felonious breaking and entering and (2) felonious larceny.

Appellant Sterling Jones was charged in a separate one-count indictment (70CR10373) with "safecracking" in violation of G.S. 14-89.1, and in a separate two-count indictment (70CR10374) with (1) felonious breaking and entering and (2) felonious larceny.

The charges in the separate indictments against Sterling Jones were the same as those in the indictments against Phillip Jones, James Edward Locklear, McKeithan Jones, Frank Jacobs, Jr., and Redell Locklear.

The record indicates that McKeithan Jones, represented by J. C. Ward, Esq., and Redell Locklear, represented by E. E.

Page, Esq., were placed on trial with appellants. The record is unclear as to whether Frank Jacobs, Jr., was also placed on trial with appellants. The record is silent as to the verdicts or other disposition of the cases against McKeithan Jones, Redell Locklear and Frank Jacobs, Jr.

At trial, appellant James Edward Locklear was represented by F. L. Musselwhite, Esq., privately employed, and appellant Sterling Jones was represented by W. C. Watts, Esq., privately employed. At trial, appellant Phillip Jones was not represented by counsel. His request for court-appointed counsel was denied on the basis of findings that he was "financially able to provide the necessary expense of legal representation" and was not an indigent within the meaning of the law.

On motion of the State, and over objections made on behalf of appellants James Edward Locklear and Sterling Jones (Sterling) by their respective counsel, the four indictments were consolidated for trial. Appellant Phillip Jones was not represented by counsel and made no objection.

Uncontradicted evidence offered by the State tends to show: Between 5:00 p.m. on June 2, 1970, and 7:00 a.m. on June 3, 1970, the building occupied by the Robeson County Department of Social Services was broken into and articles of personal property of Robeson County were stolen therefrom, to wit: A safe containing food stamps valued at $67,824.00, $62.00 in cash, and $373.50 in cashier's checks; also a Remington electric typewriter; and a Burroughs adding machine. Officers found the safe "during the month of June," 1970, in the woods, about three miles east of Maxton, off of U. S. 74. The bottom of the safe was completely cut out and the contents of the safe had been removed.

On June 1-3, 1970, McKeithan Jones (McKeithan), age 33, lived in a trailer at the I-95 Trailer Park. The other occupants of his trailer were Phillip Jones (Phillip), his nephew, and Clara Mae Clark and her seven-year-old son. State's witness Bobby Strickland (Strickland) and his wife then lived in another trailer at the I-95 Trailer Park. Sterling, brother of McKeithan, lived on Highway #710 between Rowland and Pembroke, about fifteen miles from Lumberton and about twelve miles from I-95.

Strickland, age 29, worked for McKeithan from "around the first of 1970" until the last part of July or the first of

August. During the first week in June, McKeithan, a steel erector, was subcontractor on a textile institute and school building being built "two miles out of New Bern." Strickland, Phillip and others were working for McKeithan on the New Bern job. McKeithan, Phillip and Strickland would leave the I-95 Trailer Park between 4:00 and 5:00 a.m. and get back from the New Bern job in the evening.

Sterling was not working anywhere during the first week in June, 1970. From June 15, 1970, Sterling worked for State's witness William Woodrow Brown, Jr. (Brown) on a steel erection job at a hospital in Charleston, S. C. While on this job Sterling and co-workers stayed at a motel at Moncks Corner, S. C., going from there each work day to the Charleston job.

Summarized except when quoted, the testimony of Strickland, Brown, Deputy Sheriff Stone, and Edison DeLane Lee (Lee), offered by the State, is set forth below.

Strickland testified:

Strickland, McKeithan and Phillip worked at the New Bern job on Monday, June 1st, but not on Tuesday, June 2nd, or on Wednesday, June 3rd. About 4:30 a.m. on Tuesday, June 2nd, Strickland saw McKeithan, Sterling, Phillip, and "three other fellows" he could not identify, leave the I-95 Trailer Park. Later, about 8:00 a.m., McKeithan came to Strickland's trailer; and, in response to Strickland's inquiry why they did not go to work that morning, McKeithan said "he had made a big hustle." When asked what he had hustled and who had helped him, McKeithan replied "[t]hat he, McKeithan, Phillip, Sterling, Jimmy and Redell and Frank, Jr. Jacobs had went in, had broken into Robeson County Social Services and carried away a safe and stamps in the safe." (The court admitted the testimony as to what McKeithan said to Strickland only against McKeithan. The admission thereof is the basis of Sterling's Exceptions Nos. 18 and 19.) Shortly thereafter, in Strickland's presence, McKeithan opened the trunk of his car. Strickland saw "two boxes of stamps in the car, twenty dollar books, five dollar stamps," which they carried to McKethan's trailer. About two hours later, McKeithan, accompanied by Strickland, went "on the other side of where Sterling lives" to a trash pile where McKeithan said "the stamps were," but "they were not there." McKeithan and Strickland then located Phillip, who told

McKeithan that "he had took the stamps." (This testimony as to what Phillip said was admitted only against McKeithan and Phillip.) McKeithan, Phillip and Strickland went in McKeithan's car and Phillip directed them to the place where he had hidden the stamps, "down some side roads, back of the paved road, to Smiling's house in the woods." They stopped there, got out of the car and walked about fifty yards to "where Phillip had the stamps laying on the ground, except ten thousand McKeithan had at his trailer." Phillip said "that Sterling had sale for the stamps, was to meet him at the crossroads where the stamps was."

After waiting "a half hour" Sterling came along in a truck and conversed with McKeithan and Phillip. Sterling said he had a sale for the stamps. Phillip took the truck, went back in the woods, brought the stamps and truck back to Sterling and Sterling took the truck and left. Then McKeithan and Strickland took Phillip to his house and thereafter went back to the I-95 Trailer Park. (The testimony as to statements attributed to them on this occasion was admitted only against McKeithan, Phillip and Sterling.)

Two days later McKeithan, accompanied by Strickland, picked up Phillip, Redell, James Edward Locklear and Frank Jacobs, Jr. He drove to a location "down I-94 and 74" and parked. McKeithan got out, unlocked the car, and dumped stamps from a burlap bag on the ground, and said, "let's divide them up and let each one get rid of his own." (This testimony was admitted against all defendants except Sterling.) McKeithan put on the ground "blank tickets and six thousand dollars worth of stamps." "The boys said they would leave the rest and let McKeithan get rid of them." McKeithan left the group and took what was left of the stamps and hid them. He came back about twenty minutes later and picked up the others. Later McKeithan told Strickland that "he was going to carry the stamps to South Carolina to his brother."

McKeithan and his wife, and Sterling's wife, riding in McKeithan's car, and Strickland, accompanied by his wife, riding in a truck which "pulled the trailer," "went to South Carolina to carry the stamps." The women knew nothing about the real purpose of the trip, the stated purpose being that they were going to "pick up the car Oceanus [co-worker of Sterling's] had wrecked that night." Twenty miles before they got to Moncks

State v. Jones

Corner, McKeithan stopped at "the big bridge across the river" and pulled into a side road to the right. After driving along this side road, they came to a wooded area and there McKeithan tossed the stamps out of the car into the woods. All then proceeded to Moncks Corner where Frank Jacobs, Jr., Sterling and Oceanus Lowery were living in a motel.

Strickland parked the trailer next to a service station near the motel. Then he, McKeithan, Sterling, Frank Jacobs, Jr., and Oceanus Lowery got in McKeithan's car and drove back to the river where McKeithan showed "Sterling where he had throwed the stamps." They drank some vodka and McKeithan "got high and couldn't drive." The trailer and wrecked car were left in Moncks Corner. They returned to North Carolina that night.

Some three or four days after the safe was broken into, clippings from the papers indicated that a small amount of money had been in the safe. McKeithan, Phillip and Sterling said that they had not gotten any money out of the safe, and they wanted to go back to the safe to check it. Strickland carried them there in his car, drove back into the woods and parked the car beside a canal. They walked farther down the road to where the safe was lying in a small ditch on the left. They turned it over, looked in it with a flashlight to see if there were any drawers in it with any money, but did not find anything. McKeithan, Phillip and Sterling "were talking about the night the safe was gotten that morning" and said that they "took the safe up there in the woods and dropped it off." Sterling, McKeithan and Phillip were doing the talking at that time. "They were talking about when they carried the safe up in the woods that morning, [and] left Frank Junior Jacobs and Redell with the safe, and Jimmy," while they went to look for tools to open the safe. They said that they had two crowbars and an axe and that while they were gone Redell, Jimmy and Frank, Jr., stayed there with the safe. McKeithan remarked that the money in the safe "had to have been gotten out by Jimmy, Redell and Frank Junior, while they were gone to get tools to open the safe with." (This testimony as to statements attributed to them was admitted only against McKeithan, Phillip and Sterling.)

Sitting in the woods on the ground, Strickland heard a conversation when Phillip, Frank Jacobs, Jr., Redell Locklear

and Jimmy Locklear were present. (Objection by Sterling was sustained.) Phillip was discussing with Redell and Jimmy Locklear how they opened the safe and whether there was money in it. They kept saying there was no money in the safe when they opened it. They stated they opened the safe by cutting the bottom off. Phillip said there was money in it; that he thought they had found a lot of money.

Strickland saw two crowbars and an axe under McKeithan's trailer. Phillip picked up the tools and threw them into the woods. Phillip "said he wanted [Strickland] to help him take the tools away from the trailer, that he was scared the law might come and find the tools and get the markings from the tools that would correspond with some on the safe."

Strickland testified that he worked for McKeithan a day or two during each of the two weeks following June 3rd; that he quit because McKeithan "wouldn't pay [him] for working for him" and "had been running his mouth about [him]"; and that he had voluntarily reported what he knew to Deputy Sheriff Stone "the latter part of July or first of August, at which time [he] was not in custody."

Brown testified:

In June, 1970, Brown was engaged in the erection of steel at the Charleston (S.C.) Hospital. He hired Sterling on June 15th and on June 18th hired Oscar Lowery, Frank Jacobs, Jr., and Donald Jones. On June 19th, Sterling went to Brown's office and told him he had food stamps of a value of approximately $24,000.00 for which he would take $5,000.00. Later, on June 23rd, about 6:00 p.m., Brown asked to see the stamps. Sterling said he did not have them but said he could get them and went to Brown's house about 9:30 that night. Sterling had some of the stamps in a bag and left them with Brown. On June 29th, Brown asked Sterling if he had the rest of the stamps. Sterling told Brown that, instead of the $24,000.00, "[they had] approximately twenty-eight thousand" but would take the same amount in exchange. Sterling also told Brown he had an electric typewriter and a "printing machine" he wanted to sell.

In reply to Brown's inquiry about the other stamps, Sterling said he would have to make a telephone call. Later Brown met Sterling at Sterling's motel and asked if he had gotten the stamps. Sterling replied that he had not but the stamps would

be there soon. Later Sterling advised Brown that he had the stamps but they were on the other side of Jamestown; that his car was wrecked; and that Brown would have to take him there. They went to Jamestown, crossed the Santee River bridge and then drove onto a little dirt road. While Brown was turning around, Sterling went into the woods and came back with a wet brown bag. Inside it there was a plastic bag which contained stamps. The bag was put in the truck and Brown drove to Moncks Corner.

The stamps were not counted but those first delivered to Brown by Sterling ($9,960.00 worth of stamps) and those now delivered ($18,000.00) were supposed to complete the transaction. The stamps were put in a Havoline Oil box by Brown. He told Sterling he could not get $5,000.00 for the stamps but only $3,000.00. Sterling told Brown to go ahead and take them and he would give him $600.00 for delivering the stamps to the man in charge. Brown received possession on or about June 30th and was arrested by federal officers on July 1st. He had paid Sterling at the Berkley Restaurant. Brown had checks made up "for all four."

Brown told Sterling that he had been caught with the stamps. In response to Brown's inquiry, Sterling told him "that the stamps were stolen out of a safe in Lumberton, where they got some office supplies he was trying to sell me at the same time." (This testimony was admitted only against Sterling.)

Deputy Sheriff Stone testified:

He had seen the safe prior to his first conversation with Strickland, which occurred "about the second week in July," at which time Strickland told him "that the persons who broke into the Department of Social Services were Frank Jacobs, Redell Locklear, Jimmy Locklear, Phillip Jones, Sterling Jones and McKeithan Jones." No warrants were issued until after his second conversation with Strickland, which was on August 13th. Strickland then made a full statement which was offered and admitted in evidence only as it might tend to corroborate Strickland's testimony at trial. (No objection or motion to strike was made by any defendant to the admission of the quoted statement from Strickland to Stone, which was admitted only to corroborate the testimony of Strickland.) Strickland took him to the wooded area off from the intersection of 74 and I-95 where they

found the axe and some cardboard food stamp boxes and some plastic bags.

Lee testified:

In August, 1970, Lee was in the Robeson County jail charged with armed robbery. In a discussion with Sterling in the jail, Sterling told Lee that he (Sterling) was in jail "for safecracking"; that "they didn't have anything on him, but the police came out and got some paint off his truck"; that "they had to use a truck, but they couldn't drive it, and he used it"; that "he could get a man to come up and say his truck was in the shop at the time"; that "they got the safe"; that "there was approximately seventy dollars in the safe, a lot of food stamps, about sixty-eight thousand dollars worth"; and that "he went to South Carolina with about eighteen thousand dollars worth of stamps, thinking he was going to sell them for twenty thousand, [but] that they had numbers on them and had to be gotten rid of." (This testimony as to what Sterling told Lee was admitted only against Sterling.)

Later, in the Robeson County Jail, Lee had a conversation with McKeithan and Phillip. McKeithan said that he had heard Lee's name called in court and Phillip asked what Lee "knowed on them." McKeithan told Phillip all Lee knew was what had been told him and he did not think "it would hold up in court." Then McKeithan told Lee he would give him $10,000.00 if he would say that he "was going to testify for the State and then testify for them." (This testimony as to what McKeithan and Phillip said to Lee was admitted only against McKeithan and Phillip.)

Lee also testified to statements made by McKeithan when Phillip was not present and statements made by James Edward Locklear and Redell Locklear. (When objections were made, this testimony was admitted only against the persons referred to as having made the statements.)

The State offered other evidence which tended to show that paint scrapings from the safe corresponded to paint scrapings from Sterling's truck; that food stamps negotiated by McKeithan to a grocer and that food stamps delivered by Sterling to Brown were stamps which had been removed from the safe of the Robeson County Department of Social Services; and that the safe found in the woods was the safe of the Robeson County Department of Social Services.

Evidence offered by or on behalf of defendants included the testimony of McKeithan, Phillip, James Edward Locklear and Redell Locklear. Sterling did not testify. The testimony of McKeithan and of Phillip, in direct contradiction of Strickland's testimony, tended to show that they and Strickland worked on the New Bern job on Monday, June 1st; on Tuesday, June 2nd; and on Wednesday, June 3rd. McKeithan testified that he, Strickland, and others, made a trip to Moncks Corner, South Carolina, for the purpose of taking "a trailer to O. D. Lowery," and that they returned home after delivering the trailer. McKeithan denied any connection with the crimes charged and denied having made any statements either to Strickland or to Lee with reference thereto. Phillip denied any connection with the crimes charged, denied having made any statement to Lee and denied being present on any occasion when McKeithan made a statement to Lee.

Evidence offered on behalf of Sterling tended to show his truck was in process of being repaired and was not in use during June 1st, June 2nd, and June 3rd of 1970.

A review of other evidence for the State and for defendants is unnecessary to consideration of the questions presented for decision.

The agreed case on appeal, tendered by F. L. Musselwhite as counsel for all appellants, states: "VERDICT: The jury returned a verdict that the defendants, and each of them, are guilty of felonies as charged in the Bills of Indictment."

Judgments imposing the following prison sentences upon appellants were pronounced:

As to Sterling Jones: For "safecracking," twenty years; for felonious breaking and entering, ten years; for felonious larceny, ten years; all sentences to run concurrently.

As to Phillip Jones: For "safecracking," fifteen years; for felonious breaking and entering, ten years; for felonious larceny, ten years; all sentences to run concurrently.

As to James Edward Locklear: For "safecracking," ten years; for felonious breaking and entering, five years; for felonious larceny, five years; all sentences to run concurrently.

After verdicts, judgments and appeal entries, the court, upon findings that each of the appellants was "financially un-

able to provide the necessary expenses of legal representation" incident to their appeals, appointed F. L. Musselwhite, Esq., to represent all appellants in connection with their appeals.

It appears from a death certificate attached to a motion filed in this Court by F. L. Musselwhite, Esq., that appellant James Edward Locklear died October 2, 1971. In accordance with the motion, the action against appellant James Edward Locklear and his appeal to this Court are abated.

*Attorney General Morgan and Assistant Attorney General Rich for the State.*

*Musselwhite & Musselwhite, by Fred L. Musselwhite, for defendant appellants.*

BOBBITT, Chief Justice.

Preliminary to consideration of the specific questions presented by the surviving two appellants, it is noted: First, that much of the evidence at trial and in the record before us relates to codefendants who are not parties to this appeal; second, that no objection was made by Phillip or on his behalf at trial to the consolidation of the cases for trial or to the admission of any of the evidence proffered by the State; and third, that defendants' counsel did not bring forward the charge to the jury, stating that he had "been unable to find prejudicial error" therein.

A joint brief was filed in behalf of the three appellants prior to the death of James Edward Locklear. Hereafter, unless otherwise specified, the word "appellants" will refer to Sterling Jones and to Phillip Jones.

Appellants contend the court erred by consolidating for trial the charges in the four indictments. Pertinent to this contention, the record shows: "Motion by the State to consolidate Cases Nos. 70 Cr 11226, 70 Cr 11343, 70 Cr 10374, 70 Cr 10373, involving five (5) defendants growing out of the same transaction and at the same time. Objection by James Edward Locklear and by Sterling Jones." The case on appeal states, "This constitutes appellants' Exception No. 1."

[1, 2] We adhere to "the general rule that whether defendants jointly indicted [should] be tried jointly or separately [is] in

the sound discretion of the trial court, and, in the absence of a showing that a joint trial [has] deprived the movant of a fair trial, the exercise of the court's discretion [will] not be disturbed upon appeal." *State v. Fox,* 274 N.C. 277, 288, 163 S.E. 2d 492, 500 (1968). Ordinarily, unless it is shown that irreparable prejudice will result therefrom, consolidation for trial rather than multiple individual trials is appropriate when two or more persons are indicted for the same criminal offense(s). Nothing appears to indicate that either appellant asserted any fact or stated any reason in support of his general objection. Clearly, there was no error in the consolidation *per se* of the charges in the four indictments for the purposes of trial.

The two indictments (#70CR11266 and #70CR11343) against McKeithan Jones, Phillip Jones, Frank Jacobs, Jr., Redell Locklear and James Edward Locklear, and the two indictments (#70CR10373 and #70CR10374) against Sterling Jones, charged identical offenses. The trial judge, in granting the motion to consolidate, rightly considered the four indictments the same as if there were a single indictment charging six defendants jointly with (1) "safecracking," (2) felonious breaking and entering and (3) felonious larceny.

At no time during the trial did either appellant move for a separate trial. Whether the evidence presented at trial prejudiced appellants to such extent that the failure to order separate trials, though no motions for separate trials were made, constituted a denial of due process of law, will be discussed below.

Counsel for appellants direct our attention to *State v. Cotton,* 218 N.C. 577, 12 S.E. 2d 246 (1940), and *State v. Bonner,* 222 N.C. 344, 23 S.E. 2d 45 (1942), for the proposition that their cases should not have been consolidated, or, if consolidated, they should have been severed when it became apparent that certain of the State's witnesses had testified, and would continue to testify, about statements attributed to one defendant which implicated other defendants.

In *Cotton,* husband and wife were separately indicted for the same homicide. Over their objections, the cases were consolidated for trial. The State's case against the wife consisted of testimony as to her confession in which she stated she had killed her mother under circumstances related by her in detail.

As a witness in her own behalf, the wife testified to facts tending to show that her husband had killed his mother-in-law and that her confession had been coerced by her husband and was untrue. As to the husband, the jury returned a verdict of guilty of murder in the first degree; as to the wife, the jury returned a verdict of not guilty. Upon the husband's appeal, a new trial was awarded. The reason was this: In *Cotton,* the wife's confession did not incriminate the husband at all; it was her testimony at trial, repudiating her confession, which incriminated him. Since the statute, C.S. 1802 (now G.S. 8-57), provided that a wife was not a competent witness against her husband, she could not testify to any facts which tended to incriminate him. On this ground, it was held that the court erred by the denial of the husband's motions at the conclusion of the evidence for severance and mistrial and therefore the husband was awarded a new trial.

Consideration of *State v. Todd,* 222 N.C. 346, 23 S.E. 2d 47 (1942), is necessary to an understanding of *State v. Bonner, supra.* Bonner, Fowler, McDaniel and Todd were prosecuted upon separate bills of indictment, each charging the defendant named with the murder of one Ira L. Godwin. Overruling appellants' motions for separate trials, the four indictments were consolidated for trial and tried together. McDaniel was acquitted. Bonner, Fowler and Todd were convicted of murder in the first degree. The joint appeal of Bonner and Fowler was considered by this Court in *State v. Bonner, supra.* The separate appeal of Todd was considered in *State v. Todd, supra.*

The State offered evidence that Godwin was shot and killed in the perpetration of a robbery. To identify the defendants as the persons who committed the robbery-murder, the State offered and relied *solely* upon in-custody statements made by the several defendants. The statement of each defendant was admitted in evidence only against him. Thus, the statements of Bonner, Fowler and McDaniel, although they tended to incriminate Todd, were not admitted in evidence against Todd. The only evidence admitted against Todd was his own written statement. This statement tended to *exculpate* Todd, not to incriminate him; thus, in *State v. Todd, supra,* his conviction was reversed. However, Todd's statement, although not competent or admitted against Bonner and Fowler, told in

explicit detail the manner in which Bonner and Fowler had committed the robbery and murder. Thus, *State v. Bonner, supra,* did not involve a factual situation in which a statement was admitted in evidence because it incriminated the person who made the statement *and* also incriminated a codefendant against whom the statement was not admitted. On the contrary, Todd's statement did not incriminate himself but included a full account of all circumstances pertaining to the robbery-murder of Godwin by Bonner and Fowler.

The general rule relating to the admission of the testimony of a codefendant under instructions limiting its competency to the declarant is stated and discussed below. The rationale thereof presupposes that the declaration in fact incriminates the declarant. *State v. Bonner, supra,* is to be distinguished from cases such as the present in which the declarant incriminates himself. Hereafter the appeals of Sterling Jones and of Phillip Jones will be considered separately.

### APPEAL OF STERLING JONES

[3] Sterling contends the admission of evidence of statements made by McKeithan and by Phillip which incriminated Sterling was sufficiently prejudicial to constitute a denial of due process of law notwithstanding the court instructed the jury that such statements were for consideration only against the persons who made them.

Of the seventeen exceptions cited as the basis for this contention, only Exceptions Nos. 18 and 19 are discussed in the brief. According to Strickland, on June 2nd, between the time (4:30 a.m.) he saw McKeithan, Phillip and Sterling and three others leave I-95 Trailer Park and the time (later that morning) when he, Phillip and Sterling went to the place in the woods where the stamps had been hidden, McKeithan told him "[t]hat he, McKeithan, Phillip, Sterling, Jimmy and Redell and Frank Junior Jacobs had went in, had broken into Robeson County Social Services and carried away a safe and stamps in the safe." Strickland's testimony that McKeithan made the quoted statement, which was admitted only against McKeithan, constitutes the basis of Sterling's Exceptions Nos. 18 and 19. The prejudicial impact, if any, of the testimony to which Exceptions Nos. 18 and 19 relate, notwithstanding the court's instruction that this evidence was not to be considered against Sterling,

can be evaluated only when considered in the light of the competent incriminating evidence admitted against Sterling.

Strickland's testimony included the following: About 8:00 a.m. on Tuesday, June 2nd, McKeithan had returned to the I-95 Trailer Park and had a quantity of food stamps in his possession. Two hours or so later, Strickland accompanied McKeithan and Phillip to a place in the woods where Philip had hidden the stamps, and they waited until Sterling drove up in his truck. Sterling said he had a sale for the stamps. Sterling had a portion of the stamps in his possession when he drove away in his truck. Strickland was present on another occasion when McKeithan, Phillip and Sterling were looking for the safe: He heard them talking about where they had taken the safe "in the woods and dropped it off," about procuring tools to open the safe, and about whether money as well as stamps had been removed from the safe.

Brown's testimony included the following: "Sterling Jones told me that the stamps were stolen out of a safe in Lumberton, where they got some office supplies he was trying to sell me at the same time."

Lee's testimony included the following: Sterling told Lee when both were confined in the Robeson County Jail that he (Sterling) was in jail for safecracking and that "they didn't have anything on him, but the police came out and got some paint off of his truck." Lee testified: ". . . I asked him about the safe. He said they had to use a truck, but they couldn't drive it, and he used it. That he could get a man to come up and say his truck was in the shop at the time." Lee also testified: "He said they got the safe, lots of stamps in it, wasn't much money, about seventy dollars in money."

[3] The foregoing indicates that there was sufficient competent admitted evidence against Sterling to minimize or remove such prejudice as might otherwise have been caused by the statements attributed to McKeithan on which Exceptions Nos. 18 and 19 are based. The issue turned largely on whether the jury would give credence to the testimony of Strickland, Brown and Lee. Evidence offered in behalf of defendants tended to show that the persons charged were not involved in any way in the alleged safecracking, felonious breaking and entering and felonious larceny.

It is apparent why Sterling's counsel emphasized Exceptions Nos. 18 and 19, since the testimony referred to therein implicated Sterling more directly than any other testimony. We have examined each of the other exceptions cited by Sterling but not discussed in the brief. The pertinent matters referred to in these other exceptions when considered in the light of the entire testimony are not significantly prejudicial, if prejudicial at all.

Prior to the decisions of the Supreme Court of the United States in *Bruton v. United States,* 391 U.S. 123, 20 L.Ed. 2d 476, 88 S.Ct. 1620 (1968), and *Roberts v. Russell,* 392 U.S. 293, 20 L.Ed. 2d 1100, 88 S.Ct. 1921 (1968), the general rule in North Carolina governing admission of declarations of one defendant in a joint trial was stated in *State v. Lynch,* 266 N.C. 584, 588, 146 S.E. 2d 677, 680 (1966), as follows: "Where two or more persons are jointly tried, the extrajudicial confession of one defendant may be received in evidence over the objection of his codefendant(s) when, *but only when,* the trial judge instructs the jury that the confession so offered is admitted in evidence against the defendant who made it but is not evidence and is not to be considered by the jury in any way in determining the charges against his codefendant(s). *S. v. Bennett,* 237 N.C. 749, 753, 76 S.E. 2d 42, and cases cited; *S. v. Arnold,* 258 N.C. 563, 573-574, 129 S.E. 2d 229; Stansbury, North Carolina Evidence, Second Edition, § 188. 'While the jury may find it difficult to put out of their minds the portions of such confessions that implicate the codefendant(s), this is the best the court can do; for such confession is clearly competent against the defendant who made it. Compare: *Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed. 2d 278.' *S. v. Kerley,* 246 N.C. 157, 161, 97 S.E. 2d 876." Accord, *State v. Fox, supra* at 289, 163 S.E. 2d at 500-01.

In *State v. Fox, supra,* this Court interpreted *Bruton v. United States, supra,* and *Roberts v. Russell, supra,* to require reversal of the appellants' convictions for first degree burglary and first degree murder. None of the three appellants, Roy Lee Fox, Donald Fox and Carson McMahon, had testified (except on *voir dire)* at the trial. The fourth defendant, Arrlie Fox, did testify at the trial in his own behalf and was cross-examined by the solicitor and by counsel for each of the other defendants. The State offered evidence as to statements made by each de-

fendant which incriminated himself and incriminated his code-fendants. It was held that admission of declarations made by one nontestifying defendant which incriminated another de-nied the latter's constitutional right of confrontation. The opin-ion of Justice Sharp in *State v. Fox, supra,* includes the fol-lowing: "In *Pointer v. Texas,* 380 U.S. 400, 13 L.Ed. 2d 923, 85 S.Ct. 1065 (1965), it was held that 'the Sixth Amendment's right of an accused to confront the witnesses against him is . . . a fundamental right and is made obligatory on the States by the Fourteenth Amendment.' *Id.* at 403, 13 L.Ed. 2d at 926, 85 S.Ct. at 1068." With reference to the statement attributed to Arrlie Fox, the opinion notes this distinction: "If the de-clarant can be cross-examined, a codefendant has been accorded his right to confrontation. See *State v. Kerley, supra* at 160, 97 S.E. 2d at 879. In this case, Arrlie Fox testified and was cross-examined by his codefendants. His statement, therefore, did not come within the ban of *Bruton.*" *State v. Fox, supra* at 291, 163 S.E. 2d at 502.

In *Nelson v. O'Neil,* 402 U.S. 622, 29 L.Ed. 2d 222, 91 S.Ct. 1723 (1971), the Supreme Court of the United States held that *Bruton* did not apply in a factual situation substantially the same as that in the present case. O'Neil and Runnels were tried jointly and convicted in a California state court. The State's evidence included the testimony of a police officer that Run-nels, in the absence of O'Neil, had made an oral out-of-court statement in which he admitted the crimes charged and impli-cated O'Neil as his confederate. The trial judge ruled the officer's testimony was competent against Runnels but instructed the jury not to consider it against O'Neil. Runnels, testifying in his own defense, denied having made the statement and asserted that the substance of the statement imputed to him was false. The decision in *Bruton* was confined to the holding that the right to confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution "is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination." *Nelson v. O'Neil, supra* at 627, 29 L.Ed. 2d at 227, 91 S.Ct. at 1726. The opinion further states: "We conclude that where a codefendant takes the stand in his own defense, denies making an alleged out-of-court statement implicating the de-fendant, and proceeds to testify favorably to the defendant con-cerning the underlying facts, the defendant has been denied

no rights protected by the Sixth and Fourteenth Amendments."
*Id.* at 629-30, 29 L.Ed. 2d at 228, 91 S.Ct. at 1727.

[4]  Sterling asserts prejudice on account of the admission of
portions of statements attributed to McKeithan, Phillip and
James Edward Locklear which tended to incriminate Sterling.
McKeithan, Phillip and James Edward Locklear took the stand
and each testified that the substance of the statements imputed
to him was false. Under these circumstances, as held in *Nelson
v. O'Neil, supra, Bruton* does not apply. *Cf. California v. Green,*
399 U.S. 149, 26 L.Ed. 2d 489, 90 S.Ct. 1930 (1970), and *Dut-
ton v. Evans,* 400 U.S. 74, 27 L.Ed. 2d 213, 91 S.Ct. 210 (1970).

[5]  Except as modified by *Bruton v. United States, supra,* and
*Roberts v. Russell, supra,* we adhere to the general rule (quoted
above) stated in *State v. Lynch, supra.* Even so, in each case
the prejudicial impact of testimony of out-of-court declarations
of a codefendant, even when the right to confrontation is
afforded, must be evaluated in the light of the competent ad-
mitted evidence against the nondeclarant defendant referred
to in such declarations. We do not foreclose the possibility
that the gap between the impact of evidence which is not ad-
mitted against but incriminates the nondeclarant and of com-
petent evidence of minimal probative value admitted against him
in a given case may be so great as to constitute a denial of due
process. No such gap exists in the present case.

### APPEAL OF PHILLIP JONES

Phillip contends the admission of evidence of statements
made by Sterling violated Phillip's right to confrontation as
guaranteed by the Sixth and Fourteenth Amendments to the Con-
stitution of the United States.

[6]  The evidence in the record supports the finding that Phil-
lip was "financially able to provide the necessary expense of
legal representation." He did not and does not now challenge
the court's findings or the supporting evidence. Although finan-
cially able to do so, Phillip was not represented at trial and no
objections were interposed by him or in his behalf. Unless neces-
sary to obviate manifest injustice, the rule applicable to a repre-
sented defendant applies equally to an unrepresented nonin-
digent defendant. As stated in *State v. Mitchell,* 276 N.C. 404,
409-10, 172 S.E. 2d 527, 530 (1970): "It is elementary that,

'nothing else appearing, the admission of incompetent evidence is not ground for a new trial where there was no objection at the time the evidence was offered.' . . . An assertion in this Court by the appellant that evidence, to the introduction of which he interposed no objection, was obtained in violation of his rights under the Constitution of the United States, or under the Constitution of this State, does not prevent the operation of this rule."

[4, 7] Apart from the foregoing, we find no merit in Phillip's appeal. For the reasons stated above in relation to the appeal of Sterling Jones, *Bruton* does not apply to statements attributed to McKeithan and James Edward Locklear which implicated Phillip. Since Sterling did not testify, Phillip contends that *Bruton* does apply to statements attributed to and admitted against Sterling. However, the brief fails to point out, and our examination of the record fails to disclose, any instance in which a witness testified to a statement made by Sterling which in fact implicated Phillip. The following indicate the type of statement attributed to Sterling which Phillip contends implicated him. Brown testified that Sterling told him that "there are six of us involved" and that "the stamps were stolen out of a safe in Lumberton." Lee testified that Sterling told him that "they had to use a truck" and that "they got the safe, lots of stamps in it, wasn't much money." No statement attributed to Sterling contains a reference to Phillip by name nor identifies him in any other way. The *sine qua non* for application of *Bruton* is that the party claiming incrimination without confrontation at least be incriminated.

[7] If it were conceded that Phillip was obliquely incriminated by the above statements attributed to Sterling, the constitutional error was harmless "beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 17 L.Ed. 2d 705, 710-11, 87 S.Ct. 824, 828 (1967); *Harrington v. California,* 395 U.S. 250, 23 L.Ed. 2d 284, 89 S.Ct. 1726 (1969). Any incrimination of Phillip by statements attributed to Sterling was of insignificant probative value in relation to the mass of competent and admitted evidence against him, a portion of which is included in our preliminary statement and also in our review of evidence in connection with the appeal of Sterling Jones.

The conclusion reached is that neither appellant has shown prejudicial error. Hence, the verdicts and judgments will not be disturbed.

No error.