STATE OF NORTH CAROLINA v. JIMMIE WILLIAM HICKS

No. 30

(Filed 5 October 1976)

Criminal Law § 75— admission of in-custody statement — waiver of objection

Defendant's failure to object at trial to the admission of testimony as to his in-custody statement made as a result of interrogation after he had demanded a lawyer waived his right to complain about such testimony on appeal where the statement tended to assist defendant in his defense of insanity, and it is probable that defendant desired that his statement be heard by the jury.

---

State v. Hicks

---

ON defendant's appeal under General Statute 7A-27(a) from *Wood, J.,* presiding at the December 8, 1975 Criminal Session of ROCKINGHAM Superior Court.

*Rufus L. Edmisten, Attorney General, by William F. Briley, Assistant Attorney General, for the State.*

*Walker & Melvin, by R. Martin Melvin, Attorneys for the defendant.*

EXUM, Justice.

Defendant was placed on trial for and convicted of murder in the second degree of his wife. He was sentenced to life imprisonment.

The only objection or exception which appears in the record is to the judgment of the trial court. There are no assignments of error. In defendant's brief his counsel simply states that he "has carefully reviewed the record on appeal and has been unable to find prejudicial error." Nothing, therefore, is properly presented for review. *State v. McMorris,* 290 N.C. 286, 291, 225 S.E. 2d 553, 556 (1976). Defendant's counsel asks that we review the record for error and give defendant the benefit of any that we find.

While we are not required to do so, we have nonetheless complied with counsel's request and reviewed the proceedings and the evidence leading to defendant's conviction and the judgment against him. All of the evidence in the case, both that for the State and defendant, tended to show that defendant on October 22, 1974, bludgeoned his pregnant wife to death in their home. When defendant testified in his own behalf he admitted killing his wife. He said he first hit her with a pop bottle, then stuck her with a knife, and then hit her with a block seven times. A bloody cinder block weighing nearly 24 pounds was found lying near her dead body at the scene. Her skull was crushed.

The only issue in the case raised by the evidence was whether defendant was insane at the time of the killing. Defendant's evidence tended rather persuasively to show that he suffered from mental and emotional abnormalities which had existed for some time before the killing. Dr. Bob Rollins, Director of Forensic Services for the Division of Mental Health Services of the North Carolina Department of Human Resources

and Director of the Forensic Unit at Dorothea Dix Hospital, a psychiatrist who had observed and examined the defendant over a period of several months at Dorothea Dix, testified that defendant was psychotic and suffered from schizophrenia, paranoid type. His opinion was that defendant at the time of the killing was unable to distinguish between right and wrong and in fact believed that to kill his wife was the right thing to do. Other lay witnesses for defendant, including defendant himself, tended to corroborate this assessment. Lay witnesses, however, for the State, who testified in rebuttal and who had observed defendant shortly after the killing, gave their opinion that defendant did know right from wrong and knew that he had committed a wrongful act. The jury upon proper instructions from the trial judge answered the issue of defendant's sanity in favor of the State.

One aspect of the proceedings against defendant deserves discussion. After defendant was incarcerated he was interrogated by the police. He was advised of his rights in accordance with *Miranda v. Arizona,* 384 U.S. 436 (1966). He stated that he knew his rights. He then said, "I want a lawyer or I will raise hell, I know my rights, I know my rights, if I can just get my head together, my brains are about half eat out." At this point, defendant having demanded a lawyer, the questioning should have ceased. It continued however and defendant went on to rave about how he had killed his wife. He said, in part:

"I know that Jesus will give me life, I know I will live forever, it is the only way I could give her everlasting life, you all can't understand . . . . [I]t don't make any difference because I know that my wife isn't dead, she is waiting for me, she don't have a scratch on her and she is waiting for me, I would rather kill myself than hurt her, I loved her . . . . Why should I go to Wentworth jail when my wife is outside waiting for me, she is not hurt, she is outside waiting for me and I know that. I want to go home with my wife."

No objection was made to the introduction of this statement. It is entirely probable that defendant desired this statement to be heard by the jury. His own testimony at trial was in a similar vein. While one of the witnesses for the State in rebuttal apparently based his opinion that defendant was legally sane on this pre-trial statement which the witness heard, it is arguable that the statement tends more to assist defendant on

the question of his sanity and corroborates defendant's other evidence on this issue. Under these circumstances defendant's failure to object to this testimony at trial waives his right to complain about it on appeal. *State v. Barker,* 8 N.C. App. 311, 174 S.E. 2d 88 (1970), *cert. denied,* 277 N.C. 113; *see also State v. Jones,* 280 N.C. 322, 185 S.E. 2d 858 (1972) ; *State v. Blackwell,* 276 N.C. 714, 174 S.E. 2d 534, *cert. denied,* 400 U.S. 946 (1970) ; *State v. Mitchell,* 276 N.C. 404, 172 S.E. 2d 527 (1970) ; *State v. Williams,* 276 N.C. 703, 174 S.E. 2d 503 (1970), *rev'd on other grounds,* 403 U.S. 948 (1971) ; *State v. Pressley,* 266 N.C. 663, 147 S.E. 2d 33 (1966) ; 1 Stansbury's North Carolina Evidence § 27 at 66 (Brandis Rev. 1973) ; 2 Stansbury's North Carolina Evidence § 187 at 83 (Brandis Rev. 1973). *But see State v. Pearce,* 266 N.C. 234, 145 S.E. 2d 918 (1966).

The jury has spoken. We find

No error.