STATE OF NORTH CAROLINA v. WILLIE JAMES GLADDEN

No. 342A83

(Filed 18 February 1986)

1. Bills of Discovery § 6— in-custody statement—differences from statement disclosed to defendant—failure to impose sanctions

The trial court did not err in failing to suppress portions of defendant's in-custody statement made to a detective which were not included in a statement disclosed to defendant pursuant to his discovery request or, in the alternative, to grant a continuance and compel disclosure of the differences in and additions to the disclosed statement where the prosecutor orally informed defense counsel of one difference two or three weeks prior to the trial; defendant failed to object to any portions of the detective's testimony during the trial and did not request sanctions at the time the testimony was given; defendant had a full opportunity to cross-examine the detective and to bring any discrepancies to the attention of the jury; and a review of the detective's testimony reveals that it was substantially the same as the statement provided by the State to defendant.

2. Criminal Law § 45.1— pattern search—inability to find knife—evidence not prejudicial

Assuming the inadmissibility of a detective's testimony concerning his pattern search for a knife allegedly used by deceased after throwing a metal object simulating a knife into the woods at the crime scene and his inability to find a knife during the search, the admission of such testimony did not prejudice defendant where the evidence showed that a knife was subsequently discovered in the crime scene area, and the knife was identified by defendant as the one used by deceased on the night in question.

3. Criminal Law § 43— photographs admitted as substantive evidence—prerequisites for illustrative photographs not required

Where photographs of defendant and deceased's wife were admitted as substantive evidence of defendant's motive for killing deceased and not as illustrative evidence, admission of the photographs was not improper because no witness testified that they fairly and accurately represented the scene described by the testimony, because they did not illustrate the testimony of any witness, or because the court failed to instruct the jury that they were admitted for illustrative purposes.

4. Criminal Law § 43.4— number of photographs of defendant and victim's wife—absence of prejudice

A defendant charged with homicide was not prejudiced by the number of photographs of defendant and the victim's wife admitted into evidence because he is black and the photographs revealed to the jury that the victim's wife was white since several photographs could not be more prejudicial than one in that the jury would be aware of the race of the victim's wife after the introduction of the first photograph; there was no evidence indicating that the jury was

prejudiced against defendant because he was involved in an interracial love affair; and defendant objected only to testimony identifying the photographs and failed to renew his objection at the time they were offered and received into evidence.

**5. Homicide § 15.2— laughter after shooting—competency to show mental state**

A witness's testimony that, while five hundred to one thousand yards from the scene of the shooting, he heard masculine laughter coming from the scene shortly after the shots were fired was admissible against defendant to show his mental state at the time of the shooting where there was evidence that defendant and the victim's wife were the only people other than the victim who were present at the time of the shooting.

**6. Criminal Law § 88.4— cross-examination of defendant—use of poem written by defendant**

Where defendant testified on direct examination as to the nature of his relationship with the victim's wife, the prosecution could properly cross-examine defendant through use of a poem he had written in which he professed his love for the victim's wife and stated that he did not intend to break off their relationship even though the poem contained profanity and descriptions of sexual activity.

**7. Criminal Law § 165— capital case—opening statement by prosecutor—absence of objection—appellate review**

In capital cases, an appellate court may review the prosecution's opening statement even though no objection was made at trial, but review is limited to an examination of whether the statement was so grossly improper that the trial judge abused his discretion in failing to intervene *ex mero motu.*

**8. Criminal Law § 102.4— opening statement by prosecutor supported by evidence**

Assertions made in the prosecutor's opening statement in a murder case that defendant was very upset because he was unable to see the victim's wife on a regular basis, that the victim's wife was also charged with the victim's murder, and that defendant offered a friend one thousand dollars to kill the victim were a fair and substantially accurate preview of the actual evidence.

**9. Criminal Law § 102— capital case—jury arguments—number of counsel—right to final argument**

N.C.G.S. § 84-14 is construed to mean that, although the trial court in a capital case may limit to three the number of counsel on each side who may address the jury, those three (or however many actually argue) may argue for as long as they wish and each may address the jury as many times as he desires. However, if the defendant presents evidence, all such addresses must be made prior to the prosecution's closing argument.

**10. Criminal Law § 102.7— prosecutor's jury argument—comment on credibility of witnesses**

The prosecutor's jury argument expressing a personal opinion as to the credibility of the sheriff, while improper, was not so grossly improper as to re-

State v. Gladden

quire the trial court to intervene *ex mero motu*. Furthermore, the prosecutor's argument concerning a detective that "it's an insult to my integrity and I hope to yours too, for anyone to say [the detective] would ever, in his entire life, falsify something under oath" and that "he has experiences in the past that help him in a stressful situation to remember things and keep going" was in response to defense counsel's attacks on the detective as a witness and was not improper.

**11. Criminal Law § 102.6— prosecutor's jury argument supported by evidence or inferences therefrom**

In this prosecution for first degree murder, the prosecutor's jury argument that the evidence showed that the bullet that struck the victim between the eyes was fired while he was lying in the ditch was supported by the evidence; the prosecutor's argument that there was no evidence to substantiate defendant's assertion that the victim stabbed him was a reasonable inference from the evidence presented; the prosecutor's argument that the victim's wife tried to establish an alibi through a friend was a reasonable inference from the evidence presented; and the prosecutor's argument that defendant had offered an acquaintance one thousand dollars to "knock off" the victim was supported by the evidence.

**12. Criminal Law § 102.6— jury argument—statement not supported by evidence —thrust of argument supported by evidence**

Although the defendant did not make a statement attributed to him by the prosecutor that he had told a fellow inmate to instruct the victim's wife to lie, the trial court was not required to intervene *ex mero motu* since the thrust of the prosecutor's argument was that defendant had attempted to tell the victim's wife to lie, and this assertion was amply supported by defendant's own testimony.

**13. Criminal Law § 102.9— jury argument—comment on defendant's credibility**

The prosecutor's jury argument that "The only logical inference is that [defendant] is not telling you the truth today, and I submit if I was in his shoes, I probably wouldn't either . . ." was not so grossly improper as to require the trial judge to intervene *ex mero motu.*

**14. Criminal Law § 102.7— jury argument—misstatement of law cured by instruction**

Any prejudice from the prosecutor's misstatement of the law that ". . . prior inconsistent statements show that a person is not credible or believable" was cured when the trial judge properly instructed the jury concerning the weight to be accorded to prior inconsistent statements.

**15. Criminal Law § 102.6— awareness of dying victim—jury argument supported by evidence**

The prosecutor's jury argument to the effect that the wounded and dying murder victim could hear his wife and defendant laughing at him was supported by a detective's testimony that defendant stated that, as he was leaving the scene, he knew the victim was dying because he heard the "death

gurgle," and by defendant's testimony on cross-examination that the victim was still alive and in pain when he and the victim's wife left the scene.

**16. Criminal Law § 113.1— recapitulation supported by evidence**

The trial court did not err in instructing the jury that the State offered evidence tending to show that "defendant made a statement to one of the officers that he was wearing black pants" at the time the victim died when the officer stated at one point that defendant said he was wearing *black* pants and at another point that defendant told him he was wearing *dark* pants.

**17. Criminal Law § 114.2— no expression of opinion in statement of evidence**

The trial court's statement that the State offered evidence tending to show that defendant told a detective "that he went into the ditch and crouched or lay down" while waiting for the victim was in substantial accord with the actual testimony and did not amount to an improper expression of opinion by the trial court.

**18. Criminal Law § 113.1— recapitulation of evidence—minor discrepancy not prejudicial**

The trial court's statement in summarizing the evidence that the State offered evidence tending to show that defendant told another Marine "that his girlfriend and he wanted [the victim] dead" when the Marine testified only that defendant told him that the victim's wife had asked him to kill her husband constituted a minor discrepancy not prejudicial to defendant where another witness had testified that defendant told him that "he and his girlfriend" wanted the victim killed.

**19. Criminal Law § 113.1— omission from recapitulation of evidence—error cured by subsequent instruction**

In this prosecution for first degree murder, the trial court's failure to include in its recapitulation of the evidence in the original charge any reference to defendant's claim that the victim initially attacked him with a knife was cured when the trial court subsequently instructed the jury that defendant offered evidence tending to show that "there was an initial attack upon [defendant] by [the victim] out there."

**20. Homicide § 18— premeditation and deliberation—circumstances considered**

Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; (6) evidence that the killing was done in a brutal manner; and (7) the nature and number of the victim's wounds.

**21. Homicide § 21.5— first degree murder—premeditation and deliberation—sufficiency of evidence**

There was sufficient evidence of premeditation and deliberation to support defendant's conviction for first degree murder where there was evidence

State v. Gladden

tending to show that defendant and the victim's wife were engaged in an affair; defendant and the victim's wife lured the victim to a deserted rural location by having the wife call the victim under the pretense that she had car trouble and was in need of assistance; defendant was armed with a knife and a gun; defendant slashed the victim's throat and shot him four times; after the first two gunshots had felled the victim, defendant dragged him into a ditch and shot him twice more; prior to the shooting, defendant had told a friend that the victim's wife had said she wished her husband were dead, and defendant had attempted to find someone to kill the victim; a witness who was in the area of the shooting heard male laughter coming from the vicinity of the shooting after the last two shots were fired; after the shooting, defendant disposed of certain items of evidence and attempted to hide the body and to establish an alibi for himself; and, following his arrest, defendant told a fellow inmate that if he had the chance, he would kill the victim again "for the pleasure of it."

**22. Criminal Law § 135.8— first degree murder—especially heinous, atrocious or cruel aggravating circumstance—when permitted**

A finding of the especially heinous, atrocious or cruel aggravating circumstance for first degree murder is permissible only when the level of brutality involved exceeds that normally found in first degree murder crimes, when the first degree murder in question was conscienceless, pitiless or unnecessarily torturous to the victim, or when the killing demonstrates an unusual depravity of mind on the part of defendant beyond that normally present in first degree murder. N.C.G.S. § 15A-2000(e)(9).

**23. Criminal Law § 135.8— first degree murder—especially heinous, atrocious or cruel aggravating circumstance—sufficiency of evidence**

Evidence tending to show that a first degree murder victim did not die instantaneously but lingered for some undetermined period of time and suffered extreme pain and anxiety prior to death supported submission to the jury of the especially heinous, atrocious or cruel aggravating circumstance on the ground that the murder was physically agonizing for the victim. Furthermore, evidence tending to show that defendant laughed following the two final shots and that he told a fellow inmate that he would kill the victim again "for the pleasure of it" indicates an unusual depravity of mind which would also support submission of the especially heinous, atrocious or cruel aggravating circumstance.

**24. Criminal Law § 135.9— first degree murder—failure to instruct peremptorily on mitigating circumstance**

The trial court did not err in failing peremptorily to instruct the jury on the existence of the statutory mitigating circumstance that defendant had "no significant history of prior criminal activity" and properly submitted this mitigating circumstance to the jury where, in addition to convictions for traffic offenses, evidence was introduced from which the jury could find that defendant engaged in other criminal activity, including carrying a concealed weapon. N.C.G.S. § 15A-2000(f)(1).

**25. Criminal Law § 135.9— first degree murder—failure to instruct peremptorily on mitigating circumstance**

> The trial court did not err in failing peremptorily to instruct the jury under N.C.G.S. § 15A-2000(f)(3) that the victim was a voluntary participant in defendant's homicidal act where the State produced ample evidence to contradict the defendant's claim that the victim initially attacked him with a knife.

**26. Criminal Law § 135.4— first degree murder—death sentence not disproportionate**

> A sentence of death imposed in a first degree murder case was not disproportionate to the penalty imposed in similar cases where the evidence showed that defendant attempted to hire someone to kill the victim and, when he failed, planned and participated in a scheme whereby he lured the victim, his lover's husband, to a secluded rural area; defendant slashed the victim's throat, shot him twice, dragged him into a ditch, and then shot him twice more in the face; the victim did not die instantaneously but lingered for some undetermined period of time and suffered extreme pain and anxiety prior to death; following the attack, defendant went back to his apartment and changed clothes; defendant then returned to the scene of the killing and dragged the victim's body into the woods; after disposing of the victim's wallet and watch, defendant went back to his apartment where he spent the night with the victim's wife; and the next day, defendant talked with a friend about providing him with an alibi for the previous evening.

Justice MITCHELL dissenting.

Justices EXUM and FRYE join in this dissenting opinion.

BEFORE *Tillery, J.,* at the 16 April 1982 Criminal Session of Superior Court, ONSLOW County, defendant was convicted of first-degree murder. Following a sentencing hearing held pursuant to N.C.G.S. § 15A-2000, the jury recommended that the defendant be sentenced to death. From the imposition of a sentence of death, defendant appeals as a matter of right. N.C.G.S. § 7A-27(a) (1981 and Cum. Supp. 1985). Heard in the Supreme Court 6 February 1985.

*Lacy H. Thornburg, Attorney General, by Christopher P. Brewer, Assistant Attorney General, for the State.*

*Gene B. Gurganus for defendant-appellant.*

MEYER, Justice.

The defendant was convicted of the first-degree murder of Jorge Delgado and sentenced to death. He brings forward assignments of error relative to the guilt-innocence phase and the sen-

tencing phase of his trial. Having considered the entire record and each of the assignments, we find no prejudicial error in either phase of the defendant's trial. Therefore, we leave undisturbed the defendant's conviction and sentence of death.

Evidence for the State tended to show that between 4:30 and 5:00 p.m. on 8 December 1982, a body was discovered in a wooded area approximately forty feet off of Highway 172. The body was subsequently identified as that of Marine Sergeant Jorge Delgado, a helicopter mechanic, stationed at the New River Air Station in Jacksonville, North Carolina.

Dr. Charles Garrett, an Onslow County medical examiner, performed an autopsy on the body of the victim. The autopsy revealed three gunshot wounds to the head and one to the left shoulder. The victim had also received a slash wound on the left side of the neck. Dr. Garrett testified that, in his opinion, the victim died as a result of multiple gunshot wounds to the head with the slash wound to the throat being a contributing cause of death.

Onslow County Sheriff Billy Woodward testified that on the evening of 8 December, he and other members of his staff interviewed Delsenia Delgado, the victim's wife. Early on the morning of 9 December, Sheriff Woodward and other law enforcement officials went to the defendant's residence. The officers informed the defendant that they were investigating the death of Jorge Delgado. The defendant was informed of his constitutional rights. The officers then asked for and received permission from the defendant to search his residence for weapons and bloody clothing. As a result of the search, the officers discovered a pair of shorts and a T-shirt, both of which had blood on them, and one pair of black trousers. The trousers were not cut or torn. A photo album containing a number of photographs of Mrs. Delgado alone and of Mrs. Delgado together with the defendant was also discovered. The officers also found a wrapped package which was addressed to a New York address. The package was opened with the consent of the defendant. Among other items, the package contained the disassembled parts of a .25-caliber pistol.

Detective William F. Deaton, a detective with the Onslow County Sheriff's Department, testified that he was assigned to investigate the Delgado killing. In the early morning hours of 9 December, Deaton interviewed Delsenia Delgado. After talking

with Mrs. Delgado, Detective Deaton interviewed the defendant. After being informed of his constitutional rights the defendant made a statement. Deaton testified that the defendant told him that he was with Mrs. Delgado during the early evening hours of 6 December 1982. At that time, the defendant told Mrs. Delgado that he wanted to talk with Sgt. Delgado about the two of them. The defendant and Mrs. Delgado proceeded to drive her Triumph TR-7 down Highway 24 to the intersection with Highway 172. At that point, Mrs. Delgado went into a grocery store and made a phone call. The defendant stated that Mrs. Delgado told him that she had called her husband and told him that her car was broken down on Highway 172 and that she was in need of assistance. They proceeded to drive down Highway 172, eventually stopping and pulling off the side of the road. The defendant stated that he raised the hood of the car to make it appear as though there was something wrong with the car and then crouched in the ditch alongside the shoulder of the road to await the arrival of Sgt. Delgado.

Deaton further testified that the defendant stated that Sgt. Delgado arrived driving a Mercury Cougar and was carrying a flashlight as he walked toward the TR-7. The defendant stated that he then got out of the ditch and confronted Sgt. Delgado. According to the defendant, Sgt. Delgado attacked him with a knife, striking him in the right leg. The defendant said he then pulled out a knife and slashed at Delgado, knocking him to the ground. When Delgado got back up the defendant shot him twice. He then pulled Delgado into the ditch and shot him twice more. The defendant then told Mrs. Delgado to get back into the car and leave. When asked by Mrs. Delgado if her husband was dead, the defendant told her that he was still alive but that he was dying. He stated that he knew Sgt. Delgado was dying because he had heard the "death gurgle."

Deaton further testified that the defendant stated that Mrs. Delgado drove away in the Mercury and he left driving the TR-7. At some point the TR-7 developed engine trouble and he was forced to park it near a grocery store on Highway 24. Mrs. Delgado then drove the defendant back to his apartment. Later, the defendant returned to where Sgt. Delgado's body was located. He proceeded to take the body into the woods. He also took Sgt. Delgado's wallet and watch in order to make it appear as though

he had been the victim of a robbery. He also stated that he took the knife which Sgt. Delgado had stabbed him with and threw it into the woods. The defendant said that he disposed of the watch by throwing it into some water as he crossed a bridge on Highway 17. He proceeded to the New River Air Station where he disposed of the wallet in a trash dumpster and attempted to establish an alibi. Later, he returned to his apartment. Mrs. Delgado subsequently joined him there, and they spent the night together. The defendant also stated that he was wearing a black pair of pants and a dark shirt when the incident occurred.

Steven Carpenter, a firearms technician with the State Bureau of Investigation, was tendered and accepted by the court as an expert in the field of ballistics. Mr. Carpenter stated that he compared test bullets fired from the .25-caliber pistol seized at the defendant's apartment with the bullets retrieved from the body of Sgt. Delgado. He testified that, as a result of this comparison, it was his opinion that the bullets taken from Delgado's body were fired from the gun seized at the defendant's apartment.

Corporal Benjamin Daniels testified that he met the defendant in October 1981 and that they became good friends. Daniels stated that, at some point, the defendant began seeing Mrs. Delgado. He stated that the defendant had told him that he loved Mrs. Delgado. Daniels further testified that in late May or early June 1982, the defendant told him that Mrs. Delgado had asked him to kill her husband. Daniels stated that the defendant lived with him at the trailer for a portion of the summer of 1982. According to Daniels, Mrs. Delgado would visit the defendant at the trailer two or three times a week.

Paul Peters testified that he had been recently discharged from the Marines. While in the Marines he had been assigned to the same unit as the defendant and had become acquainted with him. Peters testified that in October 1982, the defendant approached him and asked if he knew anyone who would be willing to perform a contract killing. Peters told him that he might be able to find someone. Subsequently, the defendant inquired on at least two other occasions as to whether Peters had been able to find someone to do the killing. Peters testified that, during one of these discussions, the defendant told him that the intended victim

was one Sgt. Delgado. Peters stated that the defendant told him that he and his girlfriend wanted Sgt. Delgado killed. Peters also stated that the defendant offered him $1,000 to kill Delgado, which he refused. Peters did, however, explain to the defendant two methods by which a car could be made to explode. Peters testified that the defendant took some preliminary steps to carry out one of these methods.

Corporal John Irvine testified that he was a close friend of the defendant. At the request of the defendant, Irvine went by to see the defendant on the morning of 7 December. Irvine testified that the defendant told him that he had gotten into an argument with someone the previous night and that it had been necessary for him to "defend himself" when the person tried to stab him. Irvine stated that the defendant asked that he provide him with an alibi for the night of 6 December.

David Harris testified that he was incarcerated in the Onslow County Jail in February 1983. He was placed in a cell directly across from the one occupied by the defendant. Harris stated that on one occasion they discussed Jorge Delgado. Harris testified that during the course of the conversation the defendant told him that if he could kill Delgado again, he would do so for the pleasure of it.

Lieutenant David Hunter testified that he had occasion to be in a wooded area off Highway 172 around 7:30 p.m. on 6 December 1982. Hunter stated that he heard two gunshots fired in rapid succession, followed by a scream. After a pause of approximately five to ten seconds, he heard two more shots. Hunter testified that he then heard what appeared to be laughter. He stated that while it sounded as though one person may have been laughing, he was definitely able to distinguish a masculine-sounding laugh. Hunter then got into his truck and drove down Highway 172 for a few hundred yards. At that point he came upon two vehicles, a dark colored Mercury Cougar and a black TR-7. Hunter stated that as he approached the scene the cars were driving away. Hunter followed the Cougar for some distance back toward Highway 24 going toward Jacksonville. He subsequently identified the Mercury Cougar registered to Sgt. Delgado as being one of the vehicles he observed on the evening of 6 December.

The defendant testified in his own behalf. He stated that he was transferred to Jacksonville in October 1981, after a tour of duty in Japan. He met Mrs. Delgado in February 1982, while her husband was overseas. Within a short period of time, the defendant and Mrs. Delgado began having an affair.

During the course of the affair Mrs. Delgado told the defendant that her husband physically abused her on many occasions. Other acquaintances of Mrs. Delgado also told the defendant that Sgt. Delgado physically abused her. The affair continued on a regular basis until Sgt. Delgado returned in June 1982. At that time the defendant told Mrs. Delgado that she should try to get back together with her husband. Mrs. Delgado agreed. However, Mrs. Delgado soon began calling the defendant and telling him of beatings inflicted upon her by her husband. In September 1982, they began seeing one another again. Mrs. Delgado told the defendant that her husband had found out about their affair and had threatened to kill the defendant. The defendant subsequently obtained a knife and a handgun for protection. The defendant and Mrs. Delgado continued to see each other through the fall of 1982.

The defendant testified that he and Mrs. Delgado went for a drive in her TR-7 around 6:30 p.m. on 6 December. During the drive they discussed the instances of physical abuse carried out against Mrs. Delgado by her husband. The defendant offered to go and have a talk with Sgt. Delgado. After some initial hesitation, Mrs. Delgado agreed to have the defendant talk with her husband. The defendant wanted to have a meeting in private, as he did not want people at the base to discover that he was involved with a married woman.

They decided to arrange a meeting by having Mrs. Delgado call Sgt. Delgado and tell him that her car was broken down along Highway 172. Mrs. Delgado proceeded to call her husband from a roadside grocery store. They then drove down Highway 172 and eventually stopped, parking the car on the shoulder of the road. The defendant stated that he pulled up the hood to make it appear as though they were experiencing engine trouble. The defendant testified that while he was crouched in a ditch behind the car urinating, Sgt. Delgado drove up. The defendant got out of the ditch and walked toward Sgt. Delgado. The defendant stated that Delgado shined a flashlight in his face for a few moments and

then came at him with a knife, stabbing him in the hip. The defendant testified that they struggled for a short period of time until he managed to grab his own knife and slash Delgado. Delgado momentarily dropped to his knees and then began to get back up. The defendant stated that, at this point, he fired the gun until Delgado stopped and fell. He proceeded to drag Delgado's body into the ditch. He and Mrs. Delgado then left—he driving the TR-7; she, the Mercury Cougar which Sgt. Delgado had driven to the scene. The defendant testified that the TR-7 developed engine trouble and he had to hitchhike back to his apartment.

Later that evening, the defendant went back to the scene. He proceeded to drag Delgado's body into the woods. He testified that he threw Sgt. Delgado's knife into the woods. He also took Delgado's wallet, which he later disposed of. The next day the defendant talked with John Irvine in an attempt to establish an alibi for the previous evening.

In response to evidence presented by the State, the defendant stated that he was wearing camouflage pants at the time of the incident. He also denied asking Paul Peters to kill Sgt. Delgado and testified that Peters gratuitously offered to perform the killing after learning that Delgado had threatened the defendant. He also denied telling David Harris that, if possible, he would kill Sgt. Delgado again or that he got any pleasure out of the killing. The defendant denied that he had planned or intended to kill Sgt. Delgado.

The defendant also produced witnesses who testified to his good reputation, good character, and general good nature and demeanor. The defendant also introduced the testimony of two former neighbors of the Delgados who testified that Sgt. Delgado often physically abused his wife. Also, the defendant produced three fellow inmates at the Onslow County Jail who testified that they had never heard the defendant talk about killing Delgado or that he would kill him again for the pleasure of it.

At the conclusion of the guilt-innocence determination phase of the trial, the jury returned a verdict finding the defendant guilty of murder in the first degree. The trial court then convened a sentencing hearing to determine the sentence to be imposed.

At the sentencing phase, the State introduced the testimony of Dr. Garrett. He testified that the slash wound to Sgt. Delgado's

throat contributed to his death by causing him to slowly choke to death. Dr. Garrett stated that the sensation of choking produces extreme anxiety on the part of the victim and that it is extremely painful. He also testified that one of the bullet wounds to the head was not fatal, but would have produced extreme pain due to the tissue tearing and the breaking of facial bones that resulted. He further testified that the bullet wound to the chest area would not have been fatal, but would have produced intense pain. Finally, Dr. Garrett testified that the sound which had been described as a "gurgle" was produced by the fact that there was blood in Sgt. Delgado's lungs and that as he attempted to breathe, air moved through the blood causing the gurgling sound.

The defendant offered no evidence at the sentencing phase.

Based upon the evidence introduced during the sentencing phase of the trial, the trial court instructed the jury on one possible aggravating circumstance: whether the murder was especially heinous, atrocious, or cruel. The trial court also instructed the jury on two mitigating factors: whether the defendant had no significant history of prior criminal activity and whether the victim was a voluntary participant in the homicidal act. The jury found the aggravating factor but did not find any mitigating factor and returned a recommendation that the defendant be sentenced to death. Following the recommendation, the trial court entered judgment sentencing the defendant to death.

## I.

### Guilt-Innocence Determination Phase

[1]   The defendant initially contends that the trial court erred by failing to suppress certain statements allegedly made by the defendant to Detective Deaton. Prior to the trial the defendant filed a request for voluntary discovery which requested, among other things, that the State disclose all oral statements made by the defendant which the State intended to offer into evidence. The State answered by stating that with regard to statements made by the defendant, it did intend to offer into evidence the oral statement made by the defendant to Detective Deaton. The State did not attach the substance of the oral statement because the defendant had previously been provided with a copy of the statement.

On the day of the trial, the defendant learned that there was a possibility that the prosecution might offer other statements allegedly made by the defendant which were not disclosed in response to his request for discovery. The next day the defendant filed a motion to suppress all statements of the defendant not contained in the written statement previously supplied to him or, in the alternative, for a continuance and a request that the court order the State to divulge the substance of other statements made by the defendant which it intended to offer into evidence. These motions were denied.

The defendant argues that Detective Deaton's testimony concerning the defendant's statement differed from the disclosed statement in several important respects. First, according to the disclosed statement, the defendant said that he had told Mrs. Delgado that "he wanted to talk to him [Sgt. Delgado] about himself and his wife." In his testimony, Detective Deaton stated that the defendant said he told Mrs. Delgado "that he wanted to talk with Sgt. Delgado, her husband, about the two of them *and have it out*." Second, according to the disclosed statement, "Gladden then stated he got down in the ditch by the rear of the TR-7 Triumph." At the trial, Detective Deaton testified that the defendant said he "got down into the ditch alongside the shoulder of the road *awaiting the arrival of Sgt. Delgado*." Third, according to the disclosed statement, "Gladden stated that he came out of the ditch and walked alongside the TR-7 on the highway side and stood there and stared at Sgt. Delgado." However, in his testimony, Detective Deaton stated that the defendant had said he "*glared*" at the deceased. Fourth, in the disclosed statement, the defendant said he "grabbed Delgado by the feet and dragged him down into the ditch and then shot him twice more in the face." On the stand Deaton testified that the defendant stated that he "grabbed him by his feet . . . pulled him down into the ditch, took his pistol and shot him twice more; *once between the eyes and once in the—next to the nose*." Finally, the defendant points out that there is no reference in the disclosed statement as to the color of the pants he was wearing at the time of the shooting. However, Deaton testified that the defendant said he was wearing a pair of black trousers at the time of the incident. The defendant contends that these additions and discrepancies support the State's contention that he planned to kill Delgado more

strongly than do the parallel portions of the disclosed statement. The defendant asserts that the added details and embellishments provided by Deaton tended to enhance Deaton's credibility with the jury. He therefore contends that the trial court erred by failing to suppress these portions of the statement or, in the alternative, to grant a continuance and compel disclosure of the differences in and additions to the statement. We do not agree.

We have held that the State's failure to comply with a discovery order pursuant to N.C.G.S. § 15A-903 will not automatically require the exclusion of the undisclosed evidence. *State v. Misenheimer*, 304 N.C. 108, 282 S.E. 2d 791 (1981); *State v. Stevens*, 295 N.C. 21, 243 S.E. 2d 771 (1978). A variety of sanctions is authorized under N.C.G.S. § 15A-910 for failure to comply with a discovery order. The choice of which sanction to apply, if any, rests in the sound discretion of the trial court and is not reviewable absent a showing of an abuse of that discretion. *State v. King*, 311 N.C. 603, 320 S.E. 2d 1 (1984); *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983); *State v. Stevens*, 295 N.C. 21, 243 S.E. 2d 771 (1978). A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision. *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741 (1985).

We feel that the record clearly indicates that the trial court did not abuse its discretion in failing to apply any sanction pursuant to N.C.G.S. § 15A-910. With regard to Deaton's testimony concerning the black pants, the record shows that although not contained in the statement, the prosecutor orally informed defense counsel two to three weeks prior to the trial that the defendant had stated that he was wearing a pair of black pants at the time of the shooting. Furthermore, the prosecutor permitted defense counsel to examine the pants. With respect to the other discrepancies between the disclosed statement and Deaton's testimony, we note that the defendant failed to object to any of these portions of Deaton's testimony during the trial and did not request sanctions at the time the testimony was given. Furthermore, the defendant had a full opportunity to cross-examine Detective Deaton and to bring these discrepancies to the attention of the jury. Finally, a review of the testimony in question reveals that it was substantially the same as the information provided by the State to the defendant. This assignment of error is overruled.

[2] The defendant's next argument centers on testimony by Detective Deaton concerning his attempt to locate the knife allegedly used by the deceased against the defendant. Deaton testified that the defendant told him that after returning to the scene of the shooting, he picked up the knife which Sgt. Delgado had stabbed him with and threw it into the woods along the side of the road. Deaton testified that he went to the crime scene and conducted a pattern search for the knife. Deaton stated that the first step in performing the pattern search was to throw a metal object simulating a knife into the woods. The object was retrieved and a pattern search was begun, emanating from the location of the metal object. Deaton testified that he did not discover a knife during the search. However, later in the investigation, a knife was discovered in the area where the shooting took place. That knife was identified by the defendant as the knife Delgado used to attack him. The defendant contends that the circumstances existing at the time Deaton conducted the "experiment" were not substantially similar to those existing at the time he disposed of the knife. He therefore argues that the trial court committed prejudicial error in admitting testimony concerning the throwing of the metal object into the woods, the search, and the fact that no knife was recovered as a result of the search. This argument is meritless.

Assuming, *arguendo*, that this testimony was inadmissible, it clearly could not have prejudiced the defendant. Subsequent to Deaton's search, a knife was discovered in the general area of the scene of the shooting. The defendant identified the knife as the one used by Sgt. Delgado on the night in question. The knife was admitted into evidence and passed to the jury. Clearly there was evidence before the jury in support of the defendant's contention that Delgado attacked him with a knife. This assignment of error is overruled.

[3] In his next assignment of error the defendant contends that the trial court committed prejudicial error by permitting the State to introduce into evidence certain photographs of Mrs. Delgado, some of which showed her with the defendant. The photographs in question were seized during a search of the defendant's apartment on the night that he was arrested.

The defendant initially argues that the photographs were inadmissible because the State failed to lay an adequate foundation for their admission, the photographs did not illustrate the testimony of any witness, and the court failed to instruct the jury that the photographs were introduced for illustrative purposes only. It is clear, however, that these photographs were not introduced in order to illustrate the testimony of any witness, but were instead admitted as substantive evidence tending to show a motive for the killing. Several of the photographs show the defendant and Mrs. Delgado embracing or holding hands. This tended to support the State's contention that the defendant and Mrs. Delgado were having an affair and corroborated the testimony of other prosecution witnesses who testified to this fact. Evidence that the defendant and Mrs. Delgado were romantically involved would tend to establish a motive for the killing. Since the photographs were not admitted as illustrative evidence, it was not necessary to have a witness testify that they fairly and accurately represent the scene described by the testimony. *See State v. Kistle*, 59 N.C. App. 724, 297 S.E. 2d 626 (1982), *disc. rev. denied*, 307 N.C. 471, 298 S.E. 2d 694 (1983). Also, since the photographs were not introduced as illustrative evidence, the defendant's arguments that their admission was improper due to the fact that they did not illustrate the testimony of any witness and because the court failed to instruct the jury that they were admitted solely for illustrative purposes are equally without merit.

[4] The defendant also contends that the number of photographs admitted was excessive. This argument is apparently based on the defendant's claim that he was prejudiced by the introduction of the photographs because he is black and the photographs revealed to the jury that Mrs. Delgado was white. Initially, we note that we fail to comprehend how several photographs could be said to be more prejudicial in this regard than one since the jury would be aware of Mrs. Delgado's race after the introduction of the first photograph. More importantly, however, the defendant has failed to bring to our attention any evidence which would indicate that the jury was prejudiced against him because of the fact that he was involved in an interracial love affair.

Furthermore, assuming that the admission of the photos was improper, the defendant may not now be heard to complain. While the defendant did object to the testimony identifying the

photographs, he failed to renew the objection at the time they were offered and received into evidence. We have said that a defendant is not entitled to relief where there was no objection made *at the time the evidence was offered. State v. Jones,* 280 N.C. 322, 185 S.E. 2d 858 (1972). For these reasons, this assignment of error is overruled.

[5] The defendant next contends the trial court erred in permitting Lieutenant Hunter to testify that he had heard what appeared to be male laughter emanating from the vicinity of where he had heard four gunshots. The defendant argues that because Hunter was five hundred to one thousand yards from the scene, it was impossible for him to know whether the sounds he heard were laughter. He therefore asserts that the testimony was incompetent and should have been suppressed. We disagree.

"It is well established that 'in a criminal case every circumstance calculated to throw any light on the supposed crime is admissible . . . .' " *State v. Hunt,* 297 N.C. 258, 261, 254 S.E. 2d 591, 594 (1979). Hunter testified that he was between five hundred to one thousand yards from the scene of the shooting and heard what appeared to be laughter coming from the vicinity of the shooting. This testimony tends to show the mental state of the deceased's assailant at the time of the shooting. It is therefore admissible. The defendant had an adequate opportunity to cross-examine the witness concerning his distance from the sounds. Any uncertainty as to their nature would go to the weight to be accorded the testimony, not its admission.

The defendant attempts to analogize this situation to cases dealing with the admissibility of telephone conversations where the voice on the other end of the line can be identified. *E.g., State v. Williams,* 288 N.C. 680, 220 S.E. 2d 558 (1975); *State v. Gardner,* 227 N.C. 37, 40 S.E. 2d 415 (1946). These cases held, however, that even if the witness could not positively identify the person speaking as the defendant, circumstantial evidence could be used to make the identification so that the person's statements could be admitted against the defendant. The defendant points out that Hunter did not identify the laughter as coming from the defendant, and therefore the testimony should have been excluded. While it is true that Hunter did not testify that he could identify the defendant or any other specific person as the source of the

laughter, he did testify that he heard masculine-sounding laughter coming from the very scene of the shooting shortly after the shots were fired. There was evidence by way of defendant's statement to Detective Deaton, previously admitted, and by defendant's testimony, subsequently admitted, that defendant and Mrs. Delgado were the only people, other than the victim, who were present at the time of the shooting. These circumstances are enough to support a reasonable inference that the laughter came from the only male present at the shooting, i.e., the defendant, and to render the testimony concerning the laughter admissible against him. *See State v. Walden*, 311 N.C. 667, 319 S.E. 2d 577 (1984). It was the responsibility of the jury to determine the proper weight to be accorded the testimony in light of the fact that there was no positive identification of the defendant as being the source of the laughter. This assignment of error is overruled.

[6] The defendant next argues that the trial court erred by permitting the prosecutor to read to the jury a poem written by him. The poem, which is actually a rhyme known colloquially as a "rap," comprised five and one-half pages of the trial transcript. It contained profanity and descriptions of sexual activity. The defendant contends that the rhyme was irrelevant and only served to prejudice the jury against him. We do not agree.

In the rhyme, the defendant professed his love for Mrs. Delgado and stated that he did not intend to break off their relationship. The rhyme was evidence of a material issue in the case—the defendant's feelings toward the deceased's wife—and tended to show a motive for the killing. As noted previously, we have said, "It is well established that 'in a criminal case every circumstance calculated to throw any light on the supposed crime is admissible . . . .' " *Hunt*, 297 N.C. at 261, 254 S.E. 2d at 594. The defendant claims, however, that the reading of the rhyme had no probative value because he had already testified on both direct and cross-examination as to the nature of his relationship with Mrs. Delgado. He contends the rhyme added nothing to the State's case and served only to inflame the jury's prejudice against him. However, a party has a right to cross-examine a witness as to facts which were the subject of his direct examination. *State v. Stone*, 226 N.C. 97, 36 S.E. 2d 704 (1946). *See also State v. Ziglar*, 308 N.C. 747, 304 S.E. 2d 206 (1983). Since the defendant testified on direct examination as to the nature of his relationship with

Mrs. Delgado, the prosecution was entitled to cross-examine him regarding this testimony through the use of the rhyme.

In his next assignment of error the defendant contends that the prosecutor's opening statement contained assertions of fact which were not subsequently established by the evidence. The defendant specifically points to three statements made by the prosecutor: (1) that the defendant was very upset because he was unable to see Mrs. Delgado on a regular basis, (2) that Mrs. Delgado was also charged with the murder of Sgt. Delgado, and (3) that the defendant offered a friend one thousand dollars to kill Sgt. Delgado. The defendant submits that these statements were not supported by evidence admitted at the trial.

The purpose of an opening statement is to permit the parties to present to the judge and jury the issues involved in the case and to allow them to give a general forecast of what the evidence will be. *Hays v. Missouri Pacific Railroad Company*, 304 S.W. 2d 800 (Mo. 1957); *Blackwell v. State*, 278 Md. 466, 365 A. 2d 545 (1976), *cert. denied*, 431 U.S. 918, 53 L.Ed. 2d 229 (1977); *Hilyard v. State*, 90 Okla. Crim. 435, 214 P. 2d 953 (1950); *Winter v. Unaitis*, 123 Vt. 372, 189 A. 2d 547 (1963). Trial counsel is generally afforded wide latitude in the scope of the opening statement, *Hays v. Missouri Pacific Railroad Company*, 304 S.W. 2d 800, and is generally allowed to state what he intends to show so long as the matter may be proved by admissible evidence. *Green v. State*, 172 Ga. 635, 158 S.E. 285 (1931).

[7] Initially, it must be noted that the defendant failed to lodge an objection to those portions of the opening statement of which he now complains. In capital cases, an appellate court may review the prosecution's closing argument, notwithstanding the fact that no objection was made at trial. However, review is limited to an examination of whether the argument was so grossly improper that the trial judge abused his discretion in failing to intervene *ex mero motu. State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983); *State v. Johnson*, 298 N.C. 355, 259 S.E. 2d 752 (1979). Reason dictates that the same standard apply to situations where no objection was made to the opening statement and we so hold.

[8] We conclude, however, that the prosecutor's statement was entirely proper. His recitation of the evidence in the opening

statement was substantially the same as the actual evidence presented. Concerning the statement that the defendant was upset because he had been unable to see Mrs. Delgado on a regular basis, there was testimony to the effect that after Sgt. Delgado's return, the defendant said he wanted to spend more time with Mrs. Delgado. In light of the other evidence presented, there is an inference that the defendant was upset due to the infrequency of his contacts with Mrs. Delgado. As for the prosecutor's statement that Mrs. Delgado was also charged with the murder of her husband, it is true that the State did not introduce the indictment into evidence. However, there was testimony tending to show that Mrs. Delgado was being held in the Onslow County Jail at the same time as the defendant.[1] Regarding the statement that the defendant had offered a friend a thousand dollars to kill Sgt. Delgado, Paul Peters testified that the defendant spoke with him concerning the possibility of killing Sgt. Delgado. Peters stated that they discussed a figure of one thousand dollars to perform the killing, though he could not recall which one first mentioned the amount. We conclude that the complained-of portions of the prosecutor's opening statement were a fair and substantially accurate preview of the actual evidence. This assignment of error is overruled.

[9] The defendant next assigns as error the trial court's denial of his motion to be allowed more than one jury argument. Since the defendant presented evidence, the State had the right to give the final closing argument pursuant to Rule 10 of the General Rules of Practice for the Superior and District Courts. However, the defendant contends that since this is a capital case, N.C.G.S. § 84-14 gives him the right to respond to the State's argument. N.C.G.S. § 84-14 provides:

> In all trials in the superior courts there shall be allowed two addresses to the jury for the State or plaintiff and two for the defendant, except in capital felonies, when there shall be no limit as to number. The judges of the superior court are authorized to limit the time of argument of counsel to the jury on the trial of actions, civil and criminal as follows: to not less than one hour on each side in misdemeanors and ap-

---

1. Mrs. Delgado was tried in Case No. 82-CRS-18705 in Superior Court, Onslow County, for the murder of her husband. She was found not guilty on 9 June 1983.

peals from justices of the peace; to not less than two hours on each side in all other civil actions and in felonies less than capital; in capital felonies, the time of argument of counsel may not be limited otherwise than by consent, except that the court may limit the number of those who may address the jury to three counsel on each side. Where any greater number of addresses or any extension of time are desired, motion shall be made, and it shall be in the discretion of the judge to allow the same or not, as the interests of justice may require. In jury trials the whole case as well of law as of fact may be argued to the jury.

N.C.G.S. § 84-14 places two restraints on a trial court's ability to limit jury arguments in capital felonies. First, the statute prohibits the trial court from limiting the number of addresses which can be made to the jury. Second, although the court may limit the number of attorneys who may address the jury to no less than three on each side, the statute prevents the trial court from imposing a limit on the length of the arguments. The defendant contends that the language prohibiting the limitation of the number of addresses should be interpreted to mean that a defendant in a capital case has the right to respond to the prosecutor's argument. We do not feel that this is the proper construction to be accorded this language.

In order to resolve this issue, it is necessary to examine the statutory provisions which were the forerunners of N.C.G.S. § 84-14. Our starting point is 1854 Revised Code of North Carolina ch. 31, § 57(15), which provided:

The plaintiff or defendant may employ several attorneys in his case, but more than one shall not speak thereto, unless allowed by the court; and in jury trials they may argue to the jury the whole case, as well of law as of fact.

This provision clearly limited the number of attorneys who could make the final argument.

In *State v. Collins*, 70 N.C. 241 (1874), this Court upheld the action of the trial court in limiting a defendant to an hour and a half for closing argument in a capital case. The General Assembly then enacted 1874-75 Laws of North Carolina ch. 114, § 1, which provided:

> The General Assembly of North Carolina do enact, That any counsel appearing in any civil or criminal case in any of the courts of this State shall be entitled to address the court or the jury for such a space of time as in his opinion may be necessary for the proper development and presentation of his case.

This provision was interpreted by the Court in *State v. Miller,* 75 N.C. 73 (1876). In that case, the defendant argued that the trial court erred by refusing to allow more than one of his attorneys to address the jury. We held that this provision gave a defendant the right to have more than one or all of his attorneys address the judge and jury. In interpreting the provision, this Court stated:

> It is suggested that the control of the subject is divided between the court and the counsel—that the court may limit the *number* of counsel speaking to *one,* and then that *one* may speak as long as he pleases.

> The foundation for this suggestion is Rev. Code, chap. 31, sec. 15: "The plaintiff or defendant may employ several attorneys in his case, but more than one shall not speak thereto unless allowed by the court."

> . . . .

> . . . [W]hen we have an act, the avowed object of which is to give the defendant *unlimited time,* it would be discreditable by an evasion to deprive him of the benefit of it by saying that "unlimited time" means as long as one frail counsel, already worn out with a long trial, can stand up and speak. . . . Judge Watts, in *Collins's case, supra,* thought he was the judge, and undertook directly and avowedly to limit the time to an hour and a half, to be occupied by two counsel. And the Legislature immediately said that shall not be, but any counsel appearing in the case may speak as long as he pleases. And then Judge Kerr, in this case, thought he would be the judge, and that he would do indirectly what the act prohibited from being done directly—limit the *time* by limiting the *number.* Why limit the number except to limit the time?

*Id.* at 75-77 (emphasis in original).

The code provision was later altered to read:

> Any attorney appearing in any civil or criminal action shall be entitled to address the court or the jury for such a space of time as in his opinion may be necessary for the proper development and presentation of his case; and in jury trials he may argue to the jury the whole case as well of law as of fact.

1883 Code of North Carolina ch. 4, § 30. This provision was repealed and replaced by 1903 Public Laws of North Carolina ch. 433. The new provision gave each party the right to make two addresses to the jury and authorized the judges to set specified time limits on arguments in all cases except capital felonies. Two years later, the law was amended to provide, in pertinent part: "In all trials in the superior courts there shall be allowed two addresses to the jury for the state or plaintiff and two for the defendant, *except in capital felonies when there shall be no limit as to number.*" 1905 Revisal ch. 5, § 216. This sentence was carried forward verbatim into N.C.G.S. § 84-14.

The forerunners of N.C.G.S. § 84-14 did not in any way regulate the order in which closing arguments were to be given. Instead, these early laws merely served as constraints on the trial court's ability to restrict the defense in a capital case from using all the time it deemed necessary to fully argue the case to the jury. We construe N.C.G.S. § 84-14 to mean that, although the trial court in a capital case may limit to three the number of counsel on each side who may address the jury, those three (or however many actually argue) may argue for as long as they wish and each may address the jury as many times as he desires. Thus, for example, if one defense attorney grows weary of arguing, he may allow another defense attorney to address the jury and may, upon being refreshed, rise again to make another address during the defendant's time for argument. However, if the defendant presents evidence, all such addresses must be made prior to the prosecution's closing argument.

To hold as defendant suggests—that a defendant in a capital case has the right to respond to the State's argument—could, in our view, disrupt the order of capital trials. If the defendant were given the opportunity to respond to the State's argument, the State would still have the right to give the final closing argument

under Rule 10 of the General Rules of Practice for the Superior and District Courts. However, acceptance of the defendant's contention would also entail giving him the right to respond to that argument, which the State could then respond to, which the defendant could respond to, *ad infinitum.* Such a result would destroy the orderliness of the trial and could not have been intended by the legislature. We acknowledge that there is the potential for infinite argument under N.C.G.S. § 84-14 as we have interpreted it. However, common sense would dictate that the potential for limitless or, at the very least, extremely long argument is greatly increased by the opportunity to continually respond to an adversary's address. This assignment of error is overruled.

In his next assignment of error, the defendant contends that he was prejudiced by certain portions of the prosecutor's closing argument. Specifically, he claims that certain statements were based on facts not in the record, were designed to inflame the passions and prejudices of the jury, and constituted expressions of personal belief and opinion by the prosecutor. Initially, we note that the defendant failed to object to any of these statements. Therefore, our review must be limited to the question of whether the statements were so grossly improper that the trial judge should have corrected the argument *ex mero motu. State v. Craig*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983).

Although the closing arguments of counsel are largely within the control and discretion of the trial court, it is well established that counsel is to be afforded wide latitude in the argument of fiercely contested cases. *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980); *State v. King*, 299 N.C. 707, 264 S.E. 2d 40 (1980). Counsel for both sides may argue the law and the facts in evidence, along with all reasonable inferences to be drawn from them. *State v. Lynch*, 300 N.C. 534, 268 S.E. 2d 161 (1980); *State v. Monk*, 286 N.C. 509, 212 S.E. 2d 125 (1975). Counsel may not, however, raise incompetent and prejudicial matters nor refer to facts not in evidence. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984). Counsel is also prohibited from placing before the jury his own knowledge, beliefs, and personal opinions not supported by the evidence. *State v. Locklear*, 294 N.C. 210, 241 S.E. 2d 65 (1978).

[10] Initially, the defendant contends that the trial court erred in permitting the prosecutor to personally vouch for the credibility of two of the State's witnesses, Sheriff Woodward and Detective Deaton. With regard to Sheriff Woodward, the prosecutor stated, "Let's talk about Sheriff Billy Woodward now. The Sheriff testified; one of the finest Sheriffs that I've ever met, Ladies and Gentlemen, right here. You're not going to find a finer person, a finer Sheriff." This expression of personal opinion by the prosecutor, while improper, was not, however, so grossly improper as to require the trial court to intervene *ex mero motu*. With regard to Detective Deaton, the prosecutor said

> Detective Deaton Ladies and Gentlemen, I'm sure you noticed his demeanor on the witness stand. And I think it's an insult to my integrity and I hope to yours too, for anyone to say Mr. Deaton would ever, in his entire life, falsify something under oath . . . . Moreover, he has experiences in the past that help him in a stressful situation to remember things and to keep going.

With regard to the prosecutor's argument concerning Deaton, we conclude that the defendant "opened the door" to this line of argument. *See State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. Fearing*, 304 N.C. 471, 284 S.E. 2d 487 (1981). In his closing argument, defense counsel stated that Detective Deaton "could not possibly remember . . . every detail in this case," and he insinuated that Deaton's testimony had not been truthful. The thrust of the prosecutor's argument was to refute what he perceived as an attack upon the credibility of the State's case. We hold that this portion of the argument was in response to the defense counsel's attacks on a key State witness and was not improper.

Next the defendant argues that there was no evidence to support the prosecutor's statements that after Sgt. Delgado's return from overseas, Mrs. Delgado and the defendant continued to spend nights together and went on a trip to New York and that Sgt. Delgado was making the payments on Mrs. Delgado's automobile. Evidence was introduced from which it could be inferred that the defendant and Mrs. Delgado had spent some nights together following Sgt. Delgado's return. The prosecutor's statement that Sgt. Delgado was making the payment on his

wife's car was a logical inference from the testimony of one witness that Sgt. Delgado *owned* the Triumph TR-7. There is no evidence, however, to support the prosecutor's statement that Mrs. Delgado accompanied the defendant to New York after the return of her husband. The defendant admitted traveling to New York with Mrs. Delgado *prior* to Sgt. Delgado's return, but denied taking her there after his return in June. This argument, however, was not so grossly improper as to require the court to intervene *ex mero motu.*

[11] The defendant next contends that, in his argument, the prosecutor deliberately misled the jury concerning the position of the deceased's body when one of the shots was fired. The prosecutor argued that the evidence showed that the bullet that struck Delgado between the eyes was fired while he was lying in the ditch. Detective Deaton testified that the defendant told him that after he had shot the deceased twice, he pulled him into a ditch and shot him twice more, once between the eyes and once next to his nose. Dr. Garrett also gave testimony which tended to support the prosecutor's argument. We find nothing improper with this portion of the argument.

The defendant next contends the trial court erred by permitting the prosecutor to state, "There's no evidence to substantiate the defendant's claim that Jorge Delgado cut him. None whatsoever." The defendant points out that the State introduced his statement that Delgado cut him on the right leg and produced a witness who testified that, on the night the defendant was arrested, he observed a cut on the defendant's right leg. The State, however, is not bound by the exculpatory portions of the defendant's statement if substantial contradictory evidence is introduced. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982). There was substantial evidence that the defendant was *not* cut by Sgt. Delgado. The evidence tended to show that the defendant was wearing a pair of black trousers at the time of the incident. However, there was no cut or puncture in the only pair of black pants found in a search of the defendant's apartment. We hold that the prosecutor's argument that there was no evidence to sub-

stantiate the defendant's assertion that Sgt. Delgado stabbed him was a reasonable inference from the evidence presented.

The defendant's next contention concerns the prosecutor's statement regarding the testimony of Rosa Kelly, a friend of Mrs. Delgado. The prosecutor stated, "Rosa Kelly. She said that Del [Mrs. Delgado] came by the house and she tried to establish an alibi through Rosa. They went to the base looking for her husband." The defendant claims that there was no evidence to support this statement. We disagree. Ms. Kelly testified that on the night of 6 December 1982, Mrs. Delgado came to her apartment. She testified that, later that evening, she and her boyfriend rode with Mrs. Delgado to the air base in an attempt to find Sgt. Delgado. In light of the fact that Mrs. Delgado already knew her husband was dead, Ms. Kelly's testimony raised a reasonable inference that Mrs. Delgado was attempting to establish an alibi. We find nothing improper with this portion of the argument.

The defendant next contends that the prosecutor improperly added significance to the testimony of Paul Peters when he stated, "We know that Gladden went to Peters in October and offered him a thousand dollars to 'knock off,' in his words, Jorge Delgado." The evidence previously reviewed herein relating to the discussions Peters had with the defendant about killing Sgt. Delgado supports this portion of the prosecutor's statement.

[12] The defendant's next contention relates to the prosecutor's statement concerning the defendant's testimony on cross-examination about what he said to David Harris in the Onslow County Jail. The prosecutor stated:

> He [defendant] tells you that he wouldn't tell David Harris anything, but then again, he tells you he passed notes to David Harris to tell Del to lie when she testifies about seeing him shoot Jorge Delgado in the ditch. Remember him saying that? He said "Yeah, I told him to tell her to lie". Didn't he?

The defendant argues that this was a flagrant misrepresentation of the actual testimony and required the trial court to intervene *ex mero motu*. We disagree. It is true that the defendant emphatically denied telling Harris to instruct Mrs. Delgado to lie. However, he did admit that he told Mrs. Delgado to say that she did not see him shoot Sgt. Delgado in the ditch. In essence, he

asked Mrs. Delgado to lie for him. Although the defendant did not make the exact statement attributed to him by the prosecutor, the thrust of the prosecutor's statement was that the defendant was attempting to tell Mrs. Delgado to lie. This assertion was amply supported by the defendant's own testimony.

[13] The defendant next contends that the prosecutor improperly expressed his opinion as to the defendant's credibility when he stated, "The only logical inference is that this man is not telling you the truth today, and I submit if I was in his shoes, I probably wouldn't either, Ladies and Gentlemen." Assuming, *arguendo*, that this statement was improper, it was not so grossly improper as to require the trial judge to intervene *ex mero motu*.

[14] The defendant next claims that the trial court erred by permitting the prosecutor to incorrectly state the law concerning prior inconsistent statements. In his argument, the prosecutor stated, "His Honor will instruct you that prior inconsistent statements show that a person is not credible or believable." This statement is not entirely correct since prior inconsistent statements are admissible merely for the consideration of the jury in ascertaining the credibility of the witness. 1 Brandis on North Carolina Evidence § 46 (1982). Subsequently, the trial judge properly instructed the jury concerning the weight to be accorded prior inconsistent statements and cured any possible prejudice to the defendant which may have been caused by the prosecutor's misstatement of the law. *See State v. Harris*, 290 N.C. 681, 228 S.E. 2d 437 (1976).

[15] The defendant next contends that the prosecutor misstated the facts and improperly appealed to the passions and prejudices of the jury when he stated:

> And I want you to think about and put yourselves in the shoes of Jorge Delgado as he lay, writhing in that ditch, with those bullet wounds in his head, with his trachea slashed open, and looking up, Ladies and Gentlemen, in his last gasping seconds, his wife and her lover looking over him and they were laughing at him. Think about that.

The defendant argues there was no evidence the deceased was conscious after he was shot, that he saw or heard anything, or that he made any movements. However, Detective Deaton testi-

fied that the defendant stated that as he was leaving the scene, he knew Delgado was dying because he heard the "death gurgle." On cross-examination, the defendant testified that Delgado was still alive and in pain when he and Mrs. Delgado left. The evidence supported the prosecutor's argument to this effect.

The defendant's final contention concerning the prosecutor's argument relates to the fact that the prosecutor referred to the photographs of Mrs. Delgado alone and of Mrs. Delgado with the defendant which had been introduced. As noted previously, the photographs were properly admitted into evidence. The prosecutor was, therefore, entitled to refer to and display the photographs during his closing arguments.

The defendant next argues that the trial judge erred in his summation of the evidence by inaccurately stating the evidence, by stating facts not shown in evidence, and by expressing an opinion concerning the evidence.

At the time of the defendant's trial, N.C.G.S. § 15A-1232 required the trial judge, when instructing the jury, to state the evidence to the extent necessary to explain the application of the law to the evidence. N.C.G.S. § 15A-1232 was recently amended so as to no longer require trial judges to state, summarize, or recapitulate the evidence or to explain the application of the law to the evidence. 1985 N.C. Sess. Laws ch. 537, § 1. This amendment left undisturbed the prohibition contained in N.C.G.S. § 15A-1232 against a trial judge expressing an opinion as to whether a fact has been 'proved. *Id.* This amendment is not applicable to the defendant's case, and we must analyze this issue in light of the law as it existed at the time of the trial.

Under the old law, the trial court was required to summarize the evidence in the jury charge to the extent necessary to apply the law applicable to the evidence. N.C.G.S. § 15A-1232 (1983); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354 (1978). The court, however, was not required to give a verbatim recital of the evidence. A recapitulation sufficiently comprehensive to present every substantial and essential feature of the case was sufficient. *State v. Dietz*, 289 N.C. 488, 223 S.E. 2d 357 (1976). Minor discrepancies between the evidence and the court's summation were required to be called to the attention of the court in time to afford an ade-

quate opportunity for correction. Otherwise, they were to be considered waived and would not be considered on appeal. *Id.*

Initially, we note that the trial judge instructed the jury that it was the sole judge of the facts and that he had no opinion as to what the verdict should be. He also prefaced his summary of the State's evidence by saying what the evidence "would tend to prove."

[16] The defendant first contends the trial court erred when it stated, "The State has further offered evidence which in substance would tend to show . . . . [that] the defendant made a statement to one of the officers that he was wearing black pants on the occasion when Mr. Delgado died." The defendant claims that the court improperly gave its own interpretation to Detective Deaton's testimony. At one point, Deaton stated the defendant said he was wearing a pair of *black* pants; while at another point, he testified that the defendant told him that he was wearing a pair of *dark* pants. The trial court's summation on this point was sufficiently comprehensive and was in substantial accord with the actual testimony. If the defendant had desired a more comprehensive statement of the evidence, he could have requested it. *Id.*

[17] The defendant's next claim centers on the trial court's statement that "[t]he State further offered evidence which, in substance, tends to show . . . . [t]hat the defendant told Mr. Deaton that he went into the ditch and crouched or lay down . . . ." He argues that the summation on this point constituted an improper expression of opinion in favor of the State's "ambush" theory. This contention is meritless. Deaton testified, "[H]e [the defendant] stated that he got down into the ditch alongside the shoulder of the road awaiting the arrival of Sgt. Delgado." We find that the court's summary of the evidence on this point was in substantial accord with the actual testimony. We also hold that the statement did not amount to an improper expression of opinion by the trial judge.

[18] The defendant next contends that the trial court erroneously summarized the evidence when it stated, "The State has further offered evidence, which in substance would tend to show . . . . [t]hat he told another Marine that his girl friend and he wanted Mr. Delgado dead." From a close reading of the summa-

tion, it appears that the court was referring to the testimony of Benjamin Daniels. The defendant correctly points out that Daniels did not testify that the defendant said he wanted Sgt. Delgado killed, but only testified that the defendant had told him that Mrs. Delgado had asked him to kill her husband. However, Paul Peters did testify that the defendant had told him that "he and his girl friend" wanted Sgt. Delgado killed. The trial court's summary was, therefore, substantially correct. At most, there existed a minor discrepancy which was not prejudicial to the defendant. *See State v. Roberts*, 310 N.C. 428, 312 S.E. 2d 477 (1984); *State v. Freeman*, 295 N.C. 210, 244 S.E. 2d 680 (1978). We also note that the defendant failed to object to the trial court's summary of the evidence.

[19] Finally, the defendant contends the trial court erred when it failed to include in its recapitulation of the State's evidence any reference to his claim that Sgt. Delgado initially attacked him with a knife. However, after the jury charge, the prosecutor brought to the trial court's attention the fact that the summary failed to mention that the defendant told Detective Deaton that Delgado had initiated the attack. The trial court immediately instructed the jury that "Mrs. Delgado also offered evidence, which in substance, would tend to show that there was an initial attack upon Mr. Gladden by Sgt. Delgado out there." We hold that this subsequent correction cured the omission. *State v. Corbett*, 307 N.C. 169, 297 N.C. 553 (1982).

Having examined in detail the trial judge's summary of the evidence in his charge to the jury, we find that he accurately summarized the facts to the extent necessary to apply the law applicable to the case and that it contained no expression of opinion. The few slight misstatements of the trial judge in his charge to the jury are clearly insufficient to invoke the "plain error" exception to Rule 10(b)(2) of the North Carolina Rules of Appellate Procedure.

The defendant next contends that it was error for the trial court to submit the charge of first-degree murder based on premeditation and deliberation for the jury's consideration. The defendant argues that the evidence introduced at trial was insufficient to prove the elements of premeditation and deliberation. We do not agree.

Before the issue of a defendant's guilt may be submitted to the jury, the trial court must be satisfied that substantial evidence has been introduced tending to prove each essential element of the offense charged and that the defendant was the perpetrator. *State v. Earnhardt*, 307 N.C. 62, 296 S.E. 2d 649 (1982); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d · 114 (1980). Substantial evidence must be existing and real, but need not exclude every reasonable hypothesis of innocence. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 117, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). In considering a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, and the State is entitled to every reasonable intendment and inference to be drawn therefrom. *State v. Bright*, 301 N.C. 243, 271 S.E. 2d 368 (1980). Contradictions and discrepancies are for the jury to resolve and do not warrant dismissal. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980).

Murder in the first degree is the intentional and unlawful killing of a human being with malice and with premeditation and deliberation. N.C.G.S. § 14-17 (1981 and Cum. Supp. 1985); *State v. Fleming*, 296 N.C. 559, 251 S.E. 2d 430 (1979). Premeditation means that the act was thought out beforehand for some length of time, however, short; but no particular amount of time is necessary for the mental process of premeditation. *State v. Robbins*, 275 N.C. 537, 169 S.E. 2d 858 (1969). Deliberation means an intent to kill carried out by the defendant in a cool state of blood in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation. *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). The phrase "cool state of blood" means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason. *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980).

[20] Premeditation and deliberation relate to mental processes and ordinarily are not readily susceptible to proof by direct evidence. Instead, they usually must be proved by circumstantial evidence. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). Among other circumstances to be considered in determining whether a killing was with premeditation and deliberation are: (1) want of provocation on the part of the deceased; (2) the conduct

and statements of the defendant before and after the killing; (3) threats and declarations of the defendant before and during the course of the occurrence giving rise to the death of the deceased; (4) ill-will or previous difficulty between the parties; (5) the dealing of lethal blows after the deceased has been felled and rendered helpless; and (6) evidence that the killing was done in a brutal manner. *State v. Hamlet*, 312 N.C. 162, 321 S.E. 2d 837 (1984); *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). We have also held that the nature and number of the victim's wounds are circumstances from which premeditation and deliberation can be inferred. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982).

[21] We conclude in the present case that there was substantial evidence that the killing was premeditated and deliberate and that it was not error to submit to the jury the question of the defendant's guilt on the first-degree murder charge. The evidence indicates that the defendant and Mrs. Delgado were engaged in an affair. In both his statements and his trial testimony, the defendant acknowledged that he and Mrs. Delgado had decided to "lure" the deceased to a deserted rural location by having Mrs. Delgado call her husband under the pretense that she had car trouble and was in need of assistance. The defendant was armed with a knife and a gun. The defendant slashed Sgt. Delgado's throat and shot him four times. In his statement, the defendant said that after the first two gunshots had felled Delgado, he dragged him into a ditch and shot him twice more. This would tend to rebut the defendant's claim of self-defense and would be some evidence tending to show the killing was premeditated and deliberate.

There was evidence that, prior to the shooting, the defendant had told a friend that Mrs. Delgado had said she wished her husband were dead and that the defendant had attempted to find someone to kill Sgt. Delgado. Lieutenant Hunter was in the area when the shooting occurred. He heard two shots followed several seconds later by two more shots. After the last shot, he heard what appeared to be male laughter coming from the vicinity of the shooting. Also after the shooting, the defendant disposed of certain items of evidence and attempted to hide the body and to

establish an alibi for himself. Finally, there was testimony that, following his arrest, the defendant told a fellow inmate that if he had the chance, he would kill Delgado again "for the pleasure of it." These statements and this conduct by the defendant prior to and after the event support a reasonable inference that the defendant was acting in a cool state of blood and in furtherance of a fixed design to kill the victim by a previously planned attack. Further, we note that the defendant was engaged in a romantic relationship with the deceased's wife and that there was evidence that the deceased had threatened to kill the defendant. This tended to show ill-will between the parties. In light of this evidence, we hold that there was sufficient evidence of premeditation and deliberation to take the case to the jury on the theory of premeditation and deliberation and to support the defendant's conviction for first-degree murder.

II.

*Sentencing Phase*

The defendant presents two assignments of error relative to the sentencing phase of his trial. The first assignment of error concerns the submission for consideration by the jury of the aggravating circumstance that the killing "was especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9) (1983 and Cum. Supp. 1985). The defendant contends that the evidence did not support the existence of this aggravating circumstance, which was the only aggravating circumstance submitted to the jury and found to exist.

[22] Although every murder is heinous, atrocious, and cruel, the legislature made it clear that it did not intend for this aggravating circumstance to apply in every first-degree murder case. Instead, the legislature specifically provided that this aggravating circumstance may be found only in cases in which the first-degree murder committed was *especially* heinous or *especially* atrocious or *especially* cruel. N.C.G.S. § 15A-2000(e)(9) (1983 and Cum. Supp. 1985). Therefore, a finding that this aggravating circumstance exists is only permissible when the level of brutality involved exceeds that normally found in first-degree murder crimes or when the first-degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979). We have also

said that this aggravating factor is appropriate where the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder. *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984).

In *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), we identified two types of murder as included in the category of murders which would warrant the submission of the especially heinous, atrocious, or cruel aggravating circumstance to the jury. One type involved killings which are physically agonizing for the victim or which were in some other way dehumanizing. The other type consists of those killings which are less violent, but involve the infliction of psychological torture by leaving the victim in his last moments aware of, but helpless to prevent, impending death.

In determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was "especially heinous, atrocious, or cruel," the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984). Under such an analysis, the evidence in the present case was sufficient to support the submission of the aggravating factor to the jury.

[23] The evidence tends to show that the defendant carried out a deliberate and premeditated plan to kill his lover's husband. Through the use of a ruse, the defendant lured the victim to a secluded area where he was ambushed. The deceased received three gunshot wounds to the head and one gunshot wound to the shoulder, and he suffered a slash wound to the neck which partially severed his trachea. The defendant gave a statement to the police in which he said that he slashed Sgt. Delgado's throat, shot him twice, dragged him into a nearby ditch, and then shot him twice more in the head. The defendant testified that Delgado was still alive when he and Mrs. Delgado drove away. Dr. Garrett testified that, in his opinion, the victim died as a result of the gunshot wounds to the head, with the slash wound to the throat being a contributing cause of death. Dr. Garrett further testified that the slash wound contributed to Delgado's death by causing him to slowly choke to death and that a choking sensation pro-

duces a feeling of extreme anxiety on the part of the victim and causes great pain. He also stated that although two of the bullet wounds were not fatal, they would have produced a great deal of pain. There was also evidence tending to show that the defendant laughed for several seconds after the last two shots were fired. Finally, there was testimony that, after his arrest, the defendant told a fellow inmate that if possible he would kill Sgt. Delgado again "for the pleasure of it."

Taken in the light most favorable to the State, the evidence shows that the victim did not die instantaneously, but lingered for some undetermined period of time and suffered extreme pain and anxiety prior to death. This would support a conclusion that the murder was physically agonizing for Delgado. Also, the evidence tending to show that the defendant laughed following the final two shots and that he told a fellow inmate that he would kill Delgado again "for the pleasure of it" indicates an unusual depravity of mind. *See State v. Stanley,* 310 N.C. 332, 312 S.E. 2d 393 (1984); *State v. Oliver,* 309 N.C. 326, 307 S.E. 2d 304 (1983).

The defendant argues that this case is indistinguishable from three cases in which either this Court or the United States Supreme Court held that it was error to submit this (or a substantially similar) aggravating factor to the jury. We now examine those cases briefly. In *Godfrey v. Georgia,* 446 U.S. 420, 64 L.Ed. 2d 398 (1980), the defendant went to the mobile home of his mother-in-law where his wife and eleven-year-old daughter were staying. He peered through the window and observed his wife, mother-in-law, and daughter playing a card game. He pointed a shotgun through a window and shot his wife in the forehead, killing her instantly. He immediately entered the mobile home and struck and injured his fleeing daughter with the barrel of the shotgun. He then shot his mother-in-law, killing her instantly. The jury found as an aggravating circumstance that the murder "was outrageously or wantonly vile, horrible and inhuman." The Supreme Court of Georgia affirmed the death sentence, holding the verdict was supported by the evidence. The Supreme Court of the United States held that the Supreme Court of Georgia had unconstitutionally construed the aggravating factor and stated, "There is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Id.* at 443, 64 L.Ed. 2d at 409.

In *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984), the defendant stopped his wife on the street in the presence of other family members. Upon seeing the defendant with a gun, the wife said, "Please, Stan." The defendant then shot her nine times. Although she remained conscious throughout the entire attack, we noted that there was no evidence that she suffered a torturous death. Relying in large measure upon the holding in *Godfrey*, we held that the trial court erred in permitting the jury to find as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. In *State v. Moose*, 310 N.C. 482, 313 S.E. 2d 507 (1984), the defendant, while driving a pickup truck, began to closely follow another vehicle. Eventually, the car pulled off the road into the parking lot of the drugstore. The defendant followed the car into the parking lot, pulled up beside it, and shot the victim in the head with a shotgun. We held that the evidence was insufficient to support a finding of the aggravating factor that the murder was especially heinous, atrocious, or cruel.

The defendant argues that these cases compel a finding in the case *sub judice* that it was error for this aggravating factor to be submitted to the jury. We do not agree. In these cases, there was no evidence that the victim suffered extreme pain prior to death. This is in direct contrast to the evidence here. We hold that the evidence justified submission to the jury of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

The defendant next argues that the trial court erred in failing to peremptorily instruct the jury on the existence of two statutory mitigating factors submitted by the court—that the defendant had no significant history of prior criminal activity and that the deceased was a voluntary participant in the defendant's homicidal act. This argument is without merit.

We have said that where all the evidence in a case, if believed, tends to show that a particular statutory mitigating factor exists, a peremptory instruction is proper. However, a peremptory instruction is not appropriate when the evidence surrounding that issue is conflicting. *State v. Noland*, 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied*, --- U.S. ---, 84 L.Ed. 2d 369, *reh'g denied*, --- U.S. ---, 85 L.Ed. 2d 342 (1985).

In support of his claim that the court should have peremptorily instructed the jury that he had "no significant history of prior criminal activity," N.C.G.S. § 15A-2000(f)(1), the defendant points out that he presented uncontradicted evidence that he had *no prior criminal convictions other than for traffic violations.* These violations resulted in a sixty-day suspension of his license. During this period of suspension, he drove his car, was stopped, and was subsequently convicted of driving while his license was revoked. He contends that in a capital case these activities do not as a matter of law constitute a significant history of prior criminal activity within the meaning of N.C.G.S. § 15A-2000(f)(1).

[24, 25] However, N.C.G.S. § 15A-2000(f)(1) does not speak in terms of "criminal convictions," but rather in terms of "criminal activity." Therefore, this provision does not limit the jury's inquiry to only prior convictions. *State v. Noland,* 312 N.C. 1, 320 S.E. 2d 642 (1984), *cert. denied,* --- U.S. ---, 84 L.Ed. 2d 369, *reh'g denied,* --- U.S. ---, 85 L.Ed. 2d 342 (1985). In addition to the convictions for traffic offenses, evidence was introduced from which the jury could find that the defendant engaged in other criminal activity including carrying a concealed weapon. This mitigating factor was submitted to the jury. Whether this evidence was sufficient to constitute a significant history of prior criminal activity, thereby precluding the finding of this mitigating factor, was for the jury to decide. Additionally, we hold that the trial court did not err in refusing to peremptorily instruct the jury under N.C.G.S. § 15A-2000(f)(3) that Sgt. Delgado was a voluntary participant in the defendant's homicidal act. The State produced ample evidence to contradict the defendant's claim that Delgado initially attacked him with a knife.

Furthermore, we note that the defendant failed to request the trial court to give these peremptory instructions. The failure of the defendant to make a timely request for such instructions is an additional reason for concluding that no error was committed by the trial court. *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979). This assignment of error is overruled.

We find no error in the guilt-innocence phase or the sentencing phase of defendant's trial.

## III.

### Statutory Review of Sentence by Supreme Court

Having determined that the defendant's trial was free from prejudicial error during the guilt-innocence and sentencing phases, we now turn to the duties reserved by statute to this Court in reviewing the judgment and sentence of death. Pursuant to N.C.G.S. § 15A-2000(d)(2) we are required to ascertain whether the record supports the jury's finding of the aggravating factor on which the sentencing court based its sentence of death; whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor; and whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

We have thoroughly examined the record, transcripts, and briefs in this case. We have also closely examined the exhibits which were forwarded to this Court. As analyzed and stated previously, we find that the record amply supports the submission of the aggravating factor which was considered and found by the jury. Also, we find nothing to indicate that the sentence of death was imposed under the influence of passion, prejudice, or arbitrary factors.

[26] We now undertake our final statutory duty of proportionality review. This task requires us to determine whether the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. In conducting the proportionality review, we use the "pool" of similar cases announced in *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983). The "pool" consists of all cases arising since the effective date of North Carolina's capital punishment statute, 1 June 1977, which have been tried as capital cases and have been reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

In *Williams*, we expressly rejected any approach that would utilize "mathematical or statistical models involving multiple

State v. Gladden

regression analysis or other scientific techniques, currently in vogue among social scientists." *Id.* at 80, 301 S.E. 2d at 355.

After a careful review of the record, transcripts, and exhibits, and other similar cases, we conclude that the defendant's sentence of death is not excessive or disproportionate. The evidence supports the view that the defendant attempted to hire someone to kill the victim and, when he failed, planned and participated in a scheme whereby he lured the victim, his lover's husband, to a secluded rural area. There, the defendant slashed the victim's throat, shot him twice, dragged him into a ditch, and then shot him twice more in the face. The evidence would indicate that the victim did not die instantaneously but lingered for some undetermined period of time and suffered extreme pain and anxiety prior to death. Following the attack, the defendant went back to his apartment and changed clothes. He then returned to the scene of the killing and dragged the victim's body into the woods. After disposing of the victim's wallet and watch, he went back to his apartment where he spent the night with the victim's wife. The next day, he talked with a friend about providing him with an alibi for the previous evening.

The record before us reveals a brutal and especially torturous murder. We cannot say that it does not fall within the class of first-degree murders in which we have previously upheld the death penalty. *See State v. Lawson*, 310 N.C. 632, 314 S.E. 2d 493 (1984), *cert. denied*, --- U.S. ---, 86 L.Ed. 2d 267 (1985); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We conclude that the facts of this case fully support the jury's decision to recommend a sentence of death.

IV.

*Preservation Issues*

The defendant raises six additional issues which he concedes have been recently decided against him by this Court. They are: (1) the imposition of a death sentence by a jury drawn from a venire from which potential jurors were excluded because of their

scruples against the death penalty is an unconstitutional deprivation of his right to due process of law and trial by jury; (2) the trial court erred in failing to instruct the jury during the penalty phase of the trial that if it were deadlocked a life sentence would be imposed; (3) the aggravating factor that the murder was especially heinous, atrocious, or cruel is unconstitutionally vague and overbroad as construed and applied in North Carolina; (4) the trial court erred in failing to instruct the jury that the State had the burden of proving the nonexistence of each mitigating factor beyond a reasonable doubt and in placing the burden on the defendant to prove each mitigating circumstance by a preponderance of the evidence; (5) the North Carolina death penalty statute is unconstitutional, is imposed in a discriminatory manner, and involves subjective discretion; and (6) the aggravating factor that the murder was especially heinous, atrocious, or cruel is unconstitutionally vague on its face and violates the due process clause of the fourteenth amendment.

Defense counsel, with commendable candor, admits that these issues are raised here merely to give this Court an opportunity to reexamine our previous holdings and, if we adhere to these holdings, to preserve the issues for later review by the federal courts. Having considered the defendant's arguments on these issues, we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

In conclusion, we hold that no prejudicial error was committed in either the guilt-innocence phase or the sentencing phase of the trial and that the sentence of death was not imposed under the influence of passion, prejudice or any arbitrary factor and was not disproportionate. We, therefore, leave the sentence of death undisturbed.

No error.

Justice MITCHELL dissenting.

I believe that the trial court committed reversible error requiring a new trial when it denied the defendant's motion to be allowed more than one jury argument. Therefore, I respectfully dissent.

The statute later to be codified as N.C.G.S. § 84-14 was enacted in 1903. At that time it provided that the State or plaintiff and the defendant would each be allowed two addresses to the jury in any given case. 1903 Public Laws of North Carolina ch. 433, § 2. The first sentence of the statute, which I find controlling in the present case, was amended two years later by the addition of a clause so that it now provides that: "In all trials in the superior courts there shall be allowed two addresses to the jury for the state or plaintiff and two for the defendant, *except in capital felonies when there shall be no limit as to number.*" Revisal of 1905, § 216 (emphasis added to 1905 addition). The quoted sentence from the statute has remained unchanged in the eighty years since the 1905 revision, although other sentences in the statute have been amended.[1] Therefore, the statute for eighty years has provided that "there shall be no limit as to number" of addresses to the jury for the State or for the defendant in cases tried as capital felonies.[2]

The majority construes the statute to mean only that the trial court in a capital case must allow all counsel for the defendant (subject to the trial court's power to limit them to three in number) to argue for as long as they wish and as many times as

1. The entire statute now is as follows:

§ 84-14. Court's control of argument.

In all trials in the superior court there shall be allowed two addresses to the jury for the State or plaintiff and two for the defendant, except in capital felonies, when there *shall be no limit as to number.* The judges of the superior court are authorized to limit the time of argument of counsel to the jury on the trial of actions, civil and criminal as follows: to not less than one hour on each side in misdemeanors and appeals from justices of the peace; *to not less than two* hours on each side in all other civil actions and in felonies less than capital; *in capital felonies, the time of argument of counsel may not be limited otherwise than by consent, except that the court may limit the number of those who may address the jury to three counsel on each side.* Where any greater number of addresses or any extension of time are desired, *motion shall be made, and it shall be in the discretion of the judge to allow the same or not, as the interests of justice may require.* In jury trials the whole case as well of law as of fact may be argued to the jury.

(Emphasis added.)

2. The term "capital felonies" as used in the statute is synonymous with the term "capital case" as defined in *State v. Barbour*, 295 N.C. 66, 70, 243 S.E. 2d 380, 383 (1978).

they wish. However, the majority holds that when the defendant has presented evidence, all such addresses by his counsel must be made *prior to the prosecution making a closing argument* to the jury. The majority points to no specific language requiring any such result, either in the statute or in Rule 10 of the General Rules of Practice for the Superior and District Courts, and there is none. Instead, the majority seems to base its holding upon its concern that giving the defendant and the State the right to respond to each other in capital cases by truly applying "no limit as to number" of their addresses to the jury might "destroy the orderliness of the trial and could not have been intended by the Legislature." I disagree with the majority's view of the statute.

The statute clearly provides that every party to any case "shall be allowed two addresses to the jury . . . ." This language seems to have been consistent with an established practice of the time permitting every party to a case to make a preliminary address to the jury before the presentation of evidence and to make at least one closing address. *See State v. Sheets*, 89 N.C. 543 (1883). The legislature went on to state in the same sentence, however, that in cases of capital felonies there "shall be no limit" on the number of addresses to the jury by the defendant or the State. The phrase "no limit" is plain English and means just what it says: *no limit*. Nothing in the language of the statute even hints at the limitation announced today by the majority that "all such addresses must be made prior to the prosecution's closing argument."

To apply the limitation the majority adopts to cases such as this in which the defendant is represented by only one counsel, requires this Court to evade the statutory commandment by saying that "no limit" means "as long as one frail counsel, already worn out with a long trial, can stand up and speak . . . ." *State v. Miller*, 75 N.C. 73, 76 (1876). One hundred and ten years ago this Court specifically disapproved any such approach stating that:

> It is always uncomely in anybody, and especially in a court to try how near they can come to disregarding a law without incurring responsibility. It is due to every law that it should have its full effect, not grudingly given. And then if seen to be mischievous, it may be the sooner corrected.

*Id.* I find any such approach as "uncomely" today as when disapproved by the foregoing language of this Court in 1876. I would apply the plain English used in the statute and hold that the trial court erred by refusing to permit the defendant to make more than one address to the jury in this case.

The majority has reduced the provision that there shall be "no limit as to number" of jury addresses in capital cases to a useless redundancy, since other provisions of the statute already require that the defendant be allowed at least three counsel and that the length of their arguments may not be limited. In so doing, the majority seems to have lost sight of the fact that the intent of the legislature controls in the interpretation of statutes and that:

> In seeking to discover and give effect to the legislative intent, an act must be considered as a whole, and none of its provisions shall be deemed useless or redundant if they can reasonably be considered as adding something to the act which is in harmony with its purpose.

*State v. Harvey*, 281 N.C. 1, 19-20, 187 S.E. 2d 706, 718 (1972). In my view the 1905 addition of the provision that there shall be no limit as to the number of jury addresses in capital felonies was intended by the General Assembly to add something to N.C.G.S. § 84-14, which until then provided—and still provides in noncapital cases—that each party "shall be allowed two addresses to the jury . . . ." The majority has failed to so construe the 1905 addition and has construed it, instead, as adding nothing.

After all of the evidence had been introduced during the guilt-innocence phase of the present case, counsel for the defendant specifically moved that he "be allowed more than one argument" to the jury. Even had the trial court allowed the motion and permitted the defendant to address the jury both before and after the State's "closing" argument, the State still would have been given the *final argument to the jury* during the guilt-innocence phase, as required by Rule 10 when the defendant has introduced evidence. Therefore, there is no conflict between N.C.G.S. § 84-14 and Rule 10 of the General Rules of Practice for the Superior and District Courts.

Section 13(2) of Article IV of the Constitution of North Carolina provides in pertinent part that:

> The General Assembly may make rules of procedure and practice for the Superior Court and District Court Divisions, . . . . If the General Assembly should delegate to the Supreme Court the rule-making power, the General Assembly may, nevertheless, alter, amend, or repeal any rule or procedure or practice adopted by the Supreme Court for the Superior Court or District Court Divisions.

Thus, the General Assembly had the authority to enact N.C.G.S. § 84-14.

It is clear to me that by adopting N.C.G.S. § 84-14 the General Assembly intended to grant the full benefit of counsel to defendants, plaintiffs and the State. As this Court has stated in a related but somewhat different context:

> It certainly cannot be supposed to be the policy of the Legislature to embarrass the courts so that they cannot dispatch business. Nor can it be supposed that it would, from any pique subject the judge to indignity. What we have to suppose is, that it is to be left to the discretion of *counsel*, instead of to the discretion of the *presiding judge*, how they shall address themselves to the court and jury. It must be left either to the judge or the counsel; and the Legislature has left it with the counsel. It may be that the confidence is not misplaced . . . . At any rate, the law is plain, and the experiment has to be made whether it is prudent to entrust the discussion in the courts to the *counsel* instead of to the *judge*.

*State v. Miller*, 75 N.C. 73, 75 (1876). *Cf. State v. Hardy*, 189 N.C. 799, 128 S.E. 152 (1925) (concerning the antecedents of N.C.G.S. § 84-14). Even though Rule 10 gave the State the right to open and close the arguments to the jury at the end of the guilt-innocence phase of this capital case, the defendant nevertheless had a right under N.C.G.S. § 84-14 to make addresses to the jury with "no limit as to number." Nothing in either the statute or Rule 10 requires that all such addresses by the defendant be made before the State addresses the jury. Rule 10 only requires in this regard that the State be allowed *the final argument* when the defendant has introduced evidence. Therefore, the trial court committed error requiring a new trial when it denied the defendant's motion.

Justices EXUM and FRYE join in this dissenting opinion.